Susan J. BARKER, Petitioner,

v.

**STATE BOARD OF TAX COMMISSIONERS,**
Respondent.

No. 49T10–9601–TA–00009.

Tax Court of Indiana.

May 27, 1999.

John R. Rumple, Sharpnack Bigley David & Rumple, Columbus, Indiana, Attorney for Petitioner.

Jeffrey A. Modisett, Attorney General of Indiana, Joel Schiff, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Respondent.

FISHER, J.

Susan J. Barker appeals a final determination of the State Board of Tax Commissioners (State Board) fixing the assessed value of her real property as of March 1, 1993. Barker raises one issue for the Court's determination: whether the State Board erred in denying a kit adjustment to the subject improvement.

## FACTS AND PROCEDURAL HISTORY

In 1991, Barker purchased a large warehouse located in Johnson County from Kokomo Grain, Inc. for $850,000. This warehouse is a light, pre-engineered building and was constructed at a cost of $835,200 in 1986. At some point after she purchased the warehouse, Barker filed a Form 130 Petition for Review of Assessment with the Johnson County Board of Review (BOR).[1] In that petition, Barker contended that the warehouse qualified for a kit adjustment. On August 16, 1994, the BOR denied Barker's petition. On October 3, 1994, Barker filed a Form 131 Petition for Review of Assessment with the State Board alleging that the warehouse qualified for the kit adjustment and that the grade of the warehouse should be lowered. On November 6, 1995, an administrative hearing was held before Mr. Steven King, a State Board hearing officer. On December 22, 1995, the State Board issued its final determination. In that final determination, the State Board lowered the grade of the warehouse from C to D, concluded that the subject improvement should be depreciated according to the 30–year Life Expectancy Table and denied the kit adjustment. This resulted in a true tax value for the subject improvement of $1,492,110.[2] On January 30, 1996, Barker filed this original tax appeal, and on September 6, 1996, the parties tried this cause before this Court.[3] Additional facts will be added as necessary.

## ANALYSIS AND OPINION

### Standard of Review

■ The State Board is afforded great deference when it acts within the scope of its authority. *See King Indus. Corp. v. State Bd. of Tax Comm'rs,* 699 N.E.2d 338, 339 (Ind. Tax Ct.1998). Accordingly, the Court will only reverse a State Board final determination where that determination is unsupported by substantial evidence, is arbitrary or capricious, constitutes an abuse of discretion, or exceeds statutory authority. *See id.*

### Discussion

In 1991, the State Board amended the regulations governing the 1989 general reassessment to include a 50% reduction in base price for "pre-engineered kit-type structure[s]." IND. ADMIN. CODE tit. 50, r. 2.1–4–5 Schedules A.1 and A.2 (1992) (codified in present form at *id.* r. 2.2–11–6 Schedule A.4 (1996)); *Barth, Inc. v. State Bd. of Tax Comm'rs,* 699 N.E.2d 800, 803 (Ind. Tax Ct.), *reh'g denied,* 705 N.E.2d 1084 (1998); *King Indus. Corp.,* 699 N.E.2d at 339; *Bock Prods., Inc. v. State Bd. of Tax Comm'rs,* 683 N.E.2d 1368, 1372 (Ind. Tax Ct.1997); *Mahan v. State Bd. of Tax Comm'rs,* 622 N.E.2d

---

1. The record does not reveal when Barker filed the Form 130 Petition.

2. This figure was determined by multiplying the assessed value of the subject improvement by three. *See* IND.CODE ANN. § 6–1.1–1–3 (West 1989) (amended 1997) (assessed value of property is 33 1/3% of property's true tax value). As a result of the 1997 amendment, after February 28, 2001, a property's assessed value will equal its true tax value.

3. After the trial, an amicus curiae brief was filed by Wolohan Lumber Co., a taxpayer with a similar case pending before the Court under cause no. 49T10–9608–TA–00100. In light of the Court's disposition of this case, the Court does not address the specific contentions raised by Wolohan in its brief.

1058, 1063 (Ind. Tax Ct.1993). The reduction in the base price was to account for the lower costs of construction associated with kit buildings, *see King Indus. Corp.*, 699 N.E.2d at 339, and, as the State Board notes in its brief, was in response to an inability of local assessing officials to properly assess kit buildings by using the pre-existing cost schedules and grade adjustments.[4] *See Bock Prods., Inc.*, 683 N.E.2d at 1372. After the amendments, the regulations themselves contained no guidance[5] on what constituted a "kit-type structure." Accordingly, the State Board issued a memorandum to all assessing officials on February 22, 1991 that contains a limited explanation of how the kit adjustment was to be applied. Memorandum from State Board of Tax Commissioners to All Assessing Officials (Feb. 22, 1991). Later that year, the State Board issued Instructional Bulletin 91–8 to further instruct assessing officials on how to determine which improvements qualified for the kit adjustment. Instructional Bulletin 91–8 provides examples of kit buildings and outlines several characteristics of kit buildings, e.g., Cold Cee Channel wall supports, X bracing, metal or steel exterior skin, and round steel columns. *See King Indus. Corp.*, 699 N.E.2d at 339–41.

■ Although the stated purpose of the Instructional Bulletin 91–8 was to clarify the meaning of "kit-type structures" as that term is used in the regulations, Instructional Bulletin 91–8 has "often been more confusing than helpful." *Id.* at 339. As noted in *King Industrial Corp.*, the use of language such as "economical," "minimal tolerances,"

"normal," and "heavy loads" in Instructional Bulletin 91–8 necessarily leaves much to the discretion of an individual assessor and makes it "difficult to see how any consistency or uniformity in applying the kit building adjustment can be achieved among assessors." *Id.* at 340. Moreover, instead of providing strict requirements for an improvement to qualify for a kit adjustment, Instructional Bulletin 91–8 lists some of the kit building identification features as "clues." Furthermore, Instructional Bulletin 91–8 allows improvements to vary from the basic kit model and still qualify for the kit adjustment. *See Componx, Inc. v. State Bd. of Tax Comm'rs*, 683 N.E.2d 1372, 1374 (Ind. Tax Ct.1997). Not surprisingly, this has led to some confusion in the application of the kit adjustment and has made effective judicial review of cases involving kit adjustments difficult. *See King Indus. Corp.*, 699 N.E.2d at 340 n. 4 (Instructional Bulletin 91–8 is "woefully inadequate for purposes of determining with any degree of certainty whether a building is, in fact, a kit building.").

The inadequacy of Instructional Bulletin 91–8 lies not so much in the inability of taxpayers to identify what evidence is relevant to the determination of what is a kit building, *see Whitley Prods., Inc.*, 704 N.E.2d at 1121, but rather in that Instructional Bulletin 91–8 fails to provide adequate guidance on how that evidence is to be evaluated.[6] For example, Instructional Bulletin 91–8 fails to specify which "clues" are more important than the others,[7] or even how

---

4. For an explanation of how the grading system works, see *Whitley Prods., Inc. v. State Bd. of Tax Comm'rs*, 704 N.E.2d 1113, 1116–18 (Ind. Tax Ct.1998), *review denied*.

5. The regulations presently in force contain some guidance on this issue. *See* IND. ADMIN. CODE tit. 50, r. 2.2–10–6.1(a)(1)(4)(D) (1996). The extent to which Instructional Bulletin 91–8 is applicable to cases governed by present State Board regulations is an open question. Although IND. ADMIN. CODE tit. 50, r. 4.2–1–5 (1996) provides that State Board Instructional Bulletins remain in force unless specifically rescinded or revised, the present regulations may have the effect of abrogating Instructional Bulletin 91–8 entirely or to some lesser extent.

6. The problems with the kit adjustment amendments and Instructional Bulletin 91–8 are likely

the result of the State Board attempting to adopt a flexible response to the problems encountered in applying the pre-existing cost schedules and the associated grade adjustments to kit buildings. Perhaps this explains why Instructional Bulletin 91–8, like most of the rest of the rules governing the assessment of real property in Indiana, is better suited for mass appraisal than the adjudication of specific cases. *See King Indus. Corp.*, 699 N.E.2d at 340 n. 4.

7. Although Instructional Bulletin 91–8 does not state which "clues" are more important than the others, it does state that the "key element" in identifying a kit building is its interior columns and roof beam support. *See Whitley Prods., Inc.*, 704 N.E.2d at 1121.

many of the "clues" must be satisfied in order to qualify for the kit adjustment. Additionally, Instructional Bulletin 91–8 provides little specific guidance concerning when an improvement's deviation from the basic kit model disqualifies the improvement for the kit adjustment and when an improvement's deviation from the basic kit model does not. However, Instructional Bulletin 91–8 does contain a general line of demarcation separating deviations that disqualify a particular improvement from receiving the kit adjustment and deviations that do not. The relevant consideration is the effect of the particular deviation or deviations on the cost of the improvement. Where the deviations render the particular improvement no longer "economical," the improvement no longer qualifies for the kit adjustment. *See* Instructional Bulletin 91–8 at 7; *King Indus. Corp.*, 699 N.E.2d at 340 n. 6; *Componx*, 683 N.E.2d at 1375. Unfortunately, Instructional Bulletin 91–8 does not define "economical," thereby leaving taxpayers, assessors, and the courts with an imprecise standard to distinguish kit buildings from other light pre-engineered buildings. *Cf. Garcia v. State Bd. of Tax Comm'rs*, 694 N.E.2d 794, 798 (Ind. Tax Ct.1998) (criticizing lack of precision in State Board's regulations concerning grade).

Another problem with the kit adjustment and Instructional Bulletin 91–8 is structural in nature. In Indiana, improvements are assessed based on models. *See Barth, Inc.*, 699 N.E.2d at 802–03. These models contain certain components, which are presumed to be possessed by the improvement being assessed. *See id.* at 802. All but one of the models for commercial improvements falling under the General Commercial Industrial (GCI) and General Commercial Mercantile (GCM) general use types[8] contain concrete or brick walls.[9] As a result, in the vast majority of cases, assessors must use models that have concrete or brick walls to assess steel skinned improvements required to be assessed under the GCM or GCI general use type categories. This, as can be readily foreseen, creates difficulties in assessing these improvements: Steel skinned improvements do not possess concrete or brick walls, but the models (with one exception that applies to very few improvements) used to assess them do.

■ The State Board's solution to this problem was to adopt the kit adjustment amendments[10] and the associated Instructional Bulletins. This solution did not solve the entire problem. Although steel skin is a characteristic of a kit building, not all steel skinned improvements qualify for the kit adjustment. *See* Instructional Bulletin 91–8 at 3. As a result, the State Board's solution leaves many steel skinned improvements still being assessed with models that contain concrete or brick walls. This coupled with the vagueness of Instructional Bulletin 91–8 means that taxpayers, assessors, and the courts are left to guess at how much of the problem of assessing steel skinned improvements with models that contain concrete or brick walls the State Board intended to solve when it adopted the kit adjustment amendments.

■ Although the problems described above make judicial review difficult in these kit adjustment cases, taxpayers are still entitled to effective judicial review when the State Board denies kit adjustments. *See State Bd. of Tax Comm'rs v. Town of St. John*, 702 N.E.2d 1034, 1040 n. 8 (Ind.1998). In these cases, taxpayers are required to offer probative evidence tending to demonstrate that the improvement is a kit building.

8. Because there are many models, the models for commercial and industrial improvements are grouped into three major categories: GCI, GCM, and General Commercial Residential (GCR). *See* IND. ADMIN. CODE tit. 50, r. 2.1–4–3(a) (1992) (codified in present form at *id.* r. 2.2–10–6.1 (1996)).

9. The lone exception is the GCI Mill Manufacturing model, which contains walls made of pre-engineered corrugates and metal panels. *See* IND. ADMIN. CODE tit. 50, r. 2.1–4–7(b) (1992) (codified in present form at *id.* r. 2.2–11–2(11) (1996)).

10. Generally, where an improvement deviates from the model used to assess that improvement, adjustments are necessary to account for the effect of the deviations on the true tax value of the improvement being assessed. *See Whitley Prods., Inc.*, 704 N.E.2d at 1117. In cases where steel skinned improvements are assessed with models that contain concrete or brick walls, that particular deviation is accounted for by the kit adjustment.

*See King Indus. Corp.,* 699 N.E.2d at 343. Once that is done, the State Board must come forward with probative evidence to rebut the taxpayer's showing. *See id.* In so doing, the State Board must deal with the taxpayer's evidence in a meaningful manner, *see id.,* and where the State Board fails to take relevant evidence into consideration, reversal is mandated. *See Whitley Prods., Inc.,* 704 N.E.2d at 1117 n. 3; *Vonnegut v. State Bd. of Tax Comm'rs,* 672 N.E.2d 87, 90 (Ind. Tax Ct.1996), *review denied; Simmons v. State Bd. of Tax Comm'rs,* 642 N.E.2d 559 (Ind. Tax Ct.1994); *see also Katzson Bros. v. Environmental Protection Agency,* 839 F.2d 1396, 1401 (10th Cir.1988) (where agency failed to consider relevant information in determining amount of fine, agency decision reversed).

■ At trial, Barker met this burden of production.[11] Barker presented evidence that the subject improvement was a large pre-engineered steel frame structure with light steel skin,[12] no interior partitions, no insulation, no interior finish, no heating or air conditioning and a light weight roof and roof support structure.[13] (Trial Tr. at 6–8). In addition, according to the evidence presented by Barker, the subject improvement contained the standard X bracing in the walls and the ceilings. (Trial Tr. at 6). Finally, Barker presented an affidavit of the builder of the subject improvement stating that the subject improvement was constructed in 1986 at a cost of $835,200.[14] (Pet'r Ex. 5). This is almost half of the subject improvement's true tax value after depreciation.

In its final determination, the State Board did not dispute Barker's evidence, instead, the State Board identified four features of the subject improvement that, in the State Board's view, disqualified the subject improvement for the kit adjustment. The State Board's written findings state:

> This building does not qualify as a pre-designed steel frame economy kit structure. The first two feet of the wall is concrete, not steel. With a width of 240 feet and a wall height of 24 feet, the building is too large to qualify as a kit. In addition, the roof beams are of a design that is not described in STB Bulletin 91–8 as typical of kit buildings.

(State Bd. Final Determination at 2).

At trial, the State Board hearing officer elaborated on these findings. He testified that the size of building meant that the subject improvement had to have special design features to deal with the increased stresses that large buildings encounter. (Trial Tr. at 51). In addition, the State Board hearing officer testified that the first seven feet of the steel skinned walls was reinforced.[15] (Trial Tr. at 50, 53). Lastly, the State Board hearing officer testified that because of these features, the building appeared to be of custom design, thereby, in the hearing officer's view, disqualifying the subject improvement for the kit adjustment. (Trial Tr. at 51). However, none of the features identified by the

---

**11.** Those unfamiliar with the law governing appeals from State Board final determinations may wonder why the Court is referring to a taxpayer's meeting a burden of production at trial rather than at the administrative hearing. The answer lies in the operation of IND.CODE ANN. § 6–1.1–15–6 (West 1989), which requires the Court to recreate part of the administrative record. *See Barth, Inc.,* 699 N.E.2d at 803 n. 7.

**12.** The subject improvement was assessed by using the GCI Light Warehouse model. That model contains concrete walls (Type 1) or brick walls (Type 2).

**13.** In her brief, Barker contended that the subject improvement was actually more "economical" than the basic kit model.

**14.** As discussed below, the Court does not reach the issue of whether this evidence was probative of the subject improvement's qualification for the kit adjustment. Therefore, in determining whether Barker carried her burden of production, the Court is not considering the affidavit.

**15.** The Court notes that this specific finding (along with others) was not mentioned in the State Board's final determination, though it should have been included in the State Board's written findings. *See Perez v. United States Steel Corp.,* 426 N.E.2d 29, 32–33 (Ind.1981); *see also Harborlite Corp. v. ICC,* 613 F.2d 1088, 1092–93 (D.C.Cir.1979) (discussing need for detailed written findings). However, because Barker does not argue the point, the Court will treat this finding as part of the State Board's final determination. *See Loveless Constr. Co. v. State Bd. of Tax Comm'rs,* 695 N.E.2d 1045, 1050 n. 8 (Ind. Tax Ct.1998), *review denied.*

State Board's written findings or the State Board's hearing officer expressly disqualify a particular improvement from receiving a kit adjustment.

With regard to the size of the subject improvement, the State Board contends that the width, wall[16] height and the overall size of the subject improvement disqualify it from receiving the kit adjustment. Instructional Bulletin 91–8 states that kit buildings widths are *normally* 30 feet to 120 feet. The subject improvement is double that width. That fact does give pause for concern. However, the use of the word normally leads to an inference that a particular improvement may deviate from the 120 foot width referenced in Instructional Bulletin 91–8. Additionally, when read as a whole,[17] Instructional Bulletin 91–8 clearly allows deviations from the basic kit model. *See Componx,* 683 N.E.2d at 1375. This supports the inference that the width of the subject improvement is not, in and of itself, dispositive. *Cf. King Indus. Corp.,* 699 N.E.2d at 342 (fact that improvements were not "standard size and shape" did not disqualify improvements for kit adjustment). Furthermore, even without the use of the word normally, the fact that the width of an improvement is but one "clue" in a list of ten "clues" supports the inference that a particular improvement is not required to fall within the prescribed range of widths in order to qualify for the kit adjustment. Accordingly, the Court finds that the width of the subject improvement does not automatically disqualify the subject improvement for the kit adjustment. As for the wall height of 24 feet, the Court notes that the 24 foot wall height is within the parameters of Instructional Bulletin 91–8.

Consequently, this feature actually supports the granting of the kit adjustment.[18]

As for the size itself, at trial, the hearing officer contended that the size itself rendered the subject improvement uneconomical.[19] (Trial Tr. at 71). Apparently, the hearing officer was considering only the total reproduction cost of the subject improvement rather than looking to its per square foot cost. This was improper. Large improvements are indeed expensive to build. However, in calculating the True Tax Value of an improvement, the assessor determines the per square foot reproduction cost of that improvement. *See Barth, Inc.,* 699 N.E.2d at 802 n. 5. Accordingly, the determination of whether an improvement is "economical" must be taken with reference to its per square foot reproduction cost.

The fact that the first two feet of the wall of the subject improvement is concrete also does not disqualify the subject improvement from receiving the kit adjustment. Instructional Bulletin 91–8 states that kit buildings may have "minimal building feature options," such as stone or masonry fronts or other feature options and still qualify for the kit adjustment. Instructional Bulletin 91–8 at 7; *Componx,* 683 N.E.2d at 1375. There is nothing in the record before the Court to suggest that the concrete wall is anything more than a minimal feature option that could be accounted for by adjusting the grade of the subject improvement after applying the kit adjustment.[20] Instructional Bulletin 91–8 at 7. As a result, the existence of the concrete wall does not disqualify the subject improvement for the kit adjustment.

The State Board hearing officer also referred to the fact that the first seven feet

---

**16.** The Court notes that Instructional Bulletin 91–8 refers to eave height, not wall height.

**17.** In Indiana, statutes are read as a whole, not as isolated fragments. *See Robinson v. Wroblewski,* 704 N.E.2d 467, 474 (Ind.1998) (quoting *Hinshaw v. Bd. of Comm'rs,* 611 N.E.2d 637, 639 (Ind.1993)). The same holds true for State Board Instructional Bulletins, which hold a lofty position in Indiana property tax law.

**18.** The Court acknowledges that the "clue" that refers to eave height states that the eave heights will cluster around 14 feet to 16 feet. However,

this cannot serve as a reason to disqualify an improvement with a 24 foot eave height.

**19.** Interestingly, the State Board hearing officer also testified that the subject improvement was "a low cost building." (Trial Tr. at 73).

**20.** The State Board could also use the Unit–in–Place cost tables (IND. ADMIN. CODE tit. 50, r. 2.1–4–10 (1992)) (codified in present form at *id.* r. 2.2–15–1 (1996)) to determine how much the concrete wall adds to the base rate of the subject improvement.

of the steel walls were reinforced to support the State Board's denial of the kit adjustment. Nowhere in Instructional Bulletin 91–8 is this feature described as disqualifying the subject improvement for the kit adjustment. Additionally, Instructional Bulletin 91–8 allows kit buildings to have stronger structural support systems than that of the basic kit model. Accordingly, the fact that the walls were reinforced does not disqualify the subject improvement from receiving the kit adjustment.

■ The State Board also argues that the fact that the subject improvement's roof structure is not specifically referenced in Instructional Bulletin 91–8 disqualifies the subject improvement from the kit adjustment. This argument is without merit. First of all, Instructional Bulletin 91–8 does not limit the roof beam support systems to those specifically mentioned in Instructional Bulletin 91–8. Second, and more importantly, the evidence presented at trial demonstrated that the roof structure was inexpensive and light weight. (Trial Tr. at 6, 18, 52).

■ Lastly, the State Board hearing officer referred to the "custom" design of the subject improvement. In the State Board hearing officer's view, the "custom" design was necessary to deal with the increased stresses that large buildings encounter due to their size. This too does not support the denial of the kit adjustment in this case. *See King Indus. Corp.*, 699 N.E.2d at 341–42 (fact that portion of building appeared to be of custom design did not disqualify improvement from receiving a kit adjustment). The State Board hearing officer's view perhaps resulted from a mistaken reading of the State Board's February 22, 1991 memorandum, which bars improvements built to the buyer's exact specifications from receiving the kit adjustment. There is a difference between an improvement built to a buyer's exact specifications and an improvement with some customization. Most improvements, including kit buildings, will contain some degree of customization. Instructional Bulletin 91–8 recognizes this by allowing for structur-

al "upgrades," modest interior finishes, and decorative fronts. As a result, the fact that an improvement has some degree of customization, without more, is insufficient to disqualify an improvement for a kit adjustment.

■ In the past, this Court has rejected State Board attempts to justify a denial of the kit adjustment by merely pointing to features that do not disqualify the particular improvement for the kit adjustment. *See id.; Componx*, 683 N.E.2d at 1375 (a few additional features could only disqualify an improvement for a kit adjustment "if the building in question displayed such extant characteristics that the structure could no longer be considered economical"). Although not explicitly stated in those opinions, to allow the State Board to deny the subject improvement a kit adjustment by pointing to the aforementioned features of the subject improvement would be contrary to Instructional Bulletin 91–8, which, as stated above, contemplates deviations from the basic kit model. If deviations from the basic kit model, in and of themselves, are nowhere treated as disqualifying a particular improvement for the kit adjustment in Instructional Bulletin 91–8, the State Board cannot point to those deviations to support a denial of the kit adjustment in specific cases.[21] Instead, the State Board must articulate why an improvement's deviations from the basic kit model disqualify that improvement for the kit adjustment *in that particular case.* It is not enough to say that sometimes deviations from the basic kit model disqualify an improvement and sometimes they do not— and, in this case, it is decided that they do. If the reasons for the denial of the kit adjustment are not, in all cases, dispositive of the qualification of an improvement for the kit adjustment, then those reasons cannot be used, without further explanation, to deny the kit adjustment in a particular case. Therefore, the State Board's denial of the kit adjustment cannot be upheld merely on the basis that the subject improvement contains deviations from the basic kit model.

21. Of course, if Instructional Bulletin 91–8 disqualifies a particular improvement from receiving a kit adjustment due to a particular deviation from the basic kit model, then the State Board may support its denial of a kit adjustment by pointing to that deviation.

In reaching this conclusion, the Court is not unaware of its highly deferential standard of review. *See Clark,* 694 N.E.2d at 1233–35. As Indiana's assessing expert, the State Board is afforded a great deal of discretion. However, the discretion that is properly reposed in the State Board cannot be allowed to mask unrestrained and arbitrary decisionmaking. *See Canal Square Ltd. Partnership v. State Bd. of Tax Comm'rs,* 694 N.E.2d 801, 808 (Ind. Tax Ct.1998). If the State Board were allowed to simply point to the fact that an improvement deviates from the basic kit model to justify its decision to deny the kit adjustment when the particular deviation does not disqualify the subject improvement for the kit adjustment, it is difficult to see how the decision to deny the kit adjustment was based on any principle other than the fact that the State Board said so. The law demands more of the State Board. *See Clark,* 694 N.E.2d at 1240.

This leads to the question of how the subject improvement's deviations from the basic kit model are to be treated. As stated above, Instructional Bulletin 91–8 provides a general demarcation line separating kit buildings from other pre-engineered buildings. This general demarcation line directs the inquiry in these cases to how much the deviations from the basic kit model add to the cost of the particular improvement. The State Board's final determination, however, does not reflect that this inquiry was undertaken. Nowhere in the State Board's written findings is an evaluation of how the deviations of the subject improvement from the basic kit model increased the cost of the subject improvement so as to make it uneconomical.[22] Although the State Board, Indiana's assessing expert, is afforded deference in making this inquiry, *see Loveless Constr. Co.,* 695 N.E.2d at 1047, the State Board does not have the discretion to abandon the inquiry altogether. *See Arkansas v. Oklahoma,* 503 U.S. 91, 113, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992) (agency action arbitrary and capricious where agency fails to consider "an important aspect of the problem"). By not undertaking an inquiry required by law, the State Board abused its discretion in this case, and, accordingly, the State Board's final determination must be reversed.

## REMAND INSTRUCTIONS

On remand, the State Board will have to determine how much the subject improvement's deviations from the basic kit model add to the reproduction cost of the subject improvement.[23] This inquiry necessarily will involve a quantification of these deviations' effect on the subject improvement's reproduction cost. *See King Indus. Corp.,* 699 N.E.2d at 342 (State Board must quantify deviations from norm when assigning grade to a particular improvement); *see Clark,* 694 N.E.2d at 1237 (State Board may not point to features possessed by a particular improvement and expect the Court to assume that those features have a certain impact on that improvement's reproduction cost). Then the State Board will then be required to determine whether these deviations' effect on the reproduction cost of the subject improvement render the subject improvement no longer "economical." If so, then the State Board may deny the kit adjustment.

If, on remand, the State Board determines that the kit adjustment is warranted in this case, application of the kit adjustment may produce an error in the grading of the subject improvement. *See Barth, Inc.,* 699 N.E.2d at 807. Accordingly, if the State Board chooses to apply the kit adjustment, it may then adjust the grading of the subject improvement. If that occurs, Barker may offer any evidence relevant to the grading of the subject improvement.

Finally, the Court notes that Barker presented evidence of the actual construction cost of the subject improvement in this case.

---

**22.** As noted above, the State Board hearing officer stated at trial that the subject improvement's size itself made the subject improvement uneconomical. However, in reaching that conclusion, the hearing officer did not examine the per square foot reproduction cost of the subject improvement as was required.

**23.** This duty will only be triggered if on remand Barker once again meets her burden of coming forward with probative evidence tending to demonstrate that the subject improvement qualifies for the kit adjustment.

Such evidence is not dispositive of the assessed value of a particular improvement. *See Dawkins v. State Bd. of Tax Comm'rs,* 659 N.E.2d 706, 709 (Ind. Tax Ct.1995). However, evidence of actual reproduction cost may have relevance in certain cases. *See, e.g., Zakutansky v. State Bd. of Tax Comm'rs,* 696 N.E.2d 494, 495–96 (Ind. Tax Ct.1998); *cf. Phelps Dodge v. State Bd. of Tax Comm'rs,* 705 N.E.2d 1099, 1106–07 (Ind. Tax Ct.1999) (taxpayers may offer market data in quantifying influence factors), *petition for review filed,* Mar. 22, 1999; *Clark v. State Bd. of Tax Comm'rs,* 694 N.E.2d 1230, 1241–42 & n. 18 (taxpayers may use generally recognized appraisal techniques for quantifying obsolescence). By using the terms "economical" and "dollar cost" in Instructional Bulletin 91–8, the State Board may have decided that a particular improvement's actual reproduction cost is relevant in determining whether an improvement qualifies for the kit adjustment. *See King Indus. Corp.,* 699 N.E.2d at 341 n. 6. As stated above, Barker offered evidence of the subject improvement's actual construction cost. This (putting aside the issue of the credibility of that evidence) showed a wide disparity between the actual reproduction cost of the subject improvement and its true tax value, i.e., its reproduction cost as calculated by using the State Board's regulations. At first glance, the wide disparity in this case between the purported actual construction cost of the subject improvement and its true

tax value seems, at the very least, to give pause for concern. It tends to suggest that the subject improvement is overassessed to a significant degree and that the subject improvement is indeed "economical."

If this evidence was indeed relevant, the State Board was obliged to consider it in arriving at its final determination. According to the testimony of the State Board hearing officer, the State Board did not do so. (Trial Tr. at 59). However, rather than resolve this issue, the Court will allow the State Board, the agency charged with administering this state's property tax system, to pass on this issue first. Accordingly, if Barker chooses to offer evidence of the actual reproduction cost by offering the actual construction cost of the subject improvement or otherwise on remand, the State Board will be required to expressly determine the relevancy of that evidence.

## CONCLUSION

For the aforementioned reasons, the Court REVERSES the final determination of the State Board and REMANDS this cause to the State Board for further consideration consistent with this opinion.