Arthur & Carol KEMP, Petitioners.

v.

**STATE BOARD OF TAX COMMISSIONERS,**
Respondent.

No. 49T10–9804–TA–32.

Tax Court of Indiana.

March 14, 2000.

David L. Pippen, Indianapolis, IN, Attorney for Petitioner.

Karen M. Freeman–Wilson, Attorney General of Indiana, Jeffrey S. McQuary, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

■ Petitioners Arthur and Carol Kemp (Kemps) appeal the final determination of the State Board of Tax Commissioners (State Board) denying their request to lower the assessed value of their residence for the 1995 assessment year. In this original tax appeal, the Kemps present the following three issues for the Court's review:

I. Whether the State Board exceeded its legislative authority in conducting a hearing in this matter without having issued a letter of appointment to its hearing officer;

II. Whether the State Board improperly assigned the Kemps' residence a B grade; and

III. Whether the State Board's regulations, as applied to the assessment of the Kemps' property, produced an inequitable and unjust assessment in violation of the Indiana Constitution, art. X, § 1.[1]

## FACTS AND PROCEDURAL HISTORY

The Kemps own residential real estate—parcel number 04–06–33301–027 (Parcel 27)—in LaPorte, Indiana. They filed a Form 130 petition for review of assessment with the LaPorte County Board of Review (BOR), which conducted a hearing on the petition on April 4, 1996. The

---

1. The Kemps raise two additional issues not considered by the Court: (1) whether the State Board's property assessment system, on its face, violates the Indiana Constitution; and (2) whether the State Board's final determination was supported by sufficient findings of fact. As to the issue of constitutionality, the fact that the subject improvement was assigned a grade under an unconstitutional regulation does not mean that the assessment will be invalidated on that basis. *See Whitley* Prods., Inc. v. State Bd. of Tax Comm'rs, 704 N.E.2d 1113, 1121 (Ind. Tax Ct.1998) (citations omitted), *review denied.* "Real property must still be assessed, and, until the new regulations are in place, must be assessed under the present system." *Id.* Furthermore, because of the Court's resolutions of the remaining issues, the Court need not consider whether the State Board supported its final determination with sufficient findings.

BOR, on April 10, 1996, lowered the grade assigned Parcel 27 from a B plus 1 to a B. This decreased the assessed value of Parcel 27 to $45,100.

On June 6, 1996, the Kemps filed a Form 131 petition for review of assessment with the State Board, alleging improper grade and neighborhood rating.[2] The State Board conducted a hearing on the petition on December 16, 1996. On February 18, 1998, the State Board issued its final determination. The State Board made one adjustment to the Kemps' assessment, changing the condition assigned to their home from good to average. However, this resulted in no change in the assessed value of Parcel 27.

The Kemps filed an original tax appeal with this Court on April 6, 1998. The Court conducted a trial in this matter on December 7, 1998. Oral argument was held on June 3, 1999. Additional facts will be supplied as needed.

## ANALYSIS AND OPINION

### Standard of Review

■ The Court gives great deference to the State Board's final determinations when the State Board acts within the scope of its authority. See *Wetzel Enters., Inc. v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1259, 1261 (Ind. Tax Ct.1998). Accordingly, this Court reverses final determinations of the State Board only when those decisions are unsupported by substantial evidence, are arbitrary or capricious, constitute an abuse of discretion, or exceed statutory authority. *See id.* The taxpayer bears the burden of demonstrating the invalidity of the State Board's final determination. See *Clark v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1230, 1233 (Ind. Tax Ct.1998).

**2.** The Kemps' assessment was based upon an assigned neighborhood rating of "very good." (Tr. of Proceedings at 8.) *See also* IND. ADMIN. CODE tit. 50, r. 2.2–7–7.1(f)(7) (1996) (stating that "very good" indicates an "extremely attractive and desirable area"). The State

### Discussion

The Court will consider each of the Kemps' issues in turn.

### I. *Hearing Officer's Appointment*

■ The Kemps assert that the State Board issued no written order appointing its hearing officer in this matter, Ms. Ellen Yuhan (Yuhan). To support its position, the Kemps point to Yuhan's testimony at trial, where she admitted to not having received any specific written instructions from the State Board regarding her duties as a hearing officer in the Kemps' appeal. (Trial Tr. at 9.) Therefore, the Kemps contend that the State Board's actions exceeded its legislative authority. However, there is no evidence in the record that the Kemps objected to Yuhan's authority at the administrative level, either at the hearing or during the physical inspection of the subject property, to hear the Kemps' appeal on behalf of the State Board. Therefore, the Court finds that the Kemps' silence at the administrative level on the issue of Yuhan's authority to conduct the hearing constituted consent to the hearing. The Kemps thus waived the issue and may not now raise the issue for the first time in their original tax appeal. *See Hoogenboom–Nofziger v. State Bd. of Tax Comm'rs*, 715 N.E.2d 1018, 1021–22 (Ind. Tax Ct.1999).

### II. *Grade*

The Kemps challenge the B grade assigned their home by the BOR and affirmed by the State Board. To support their claim, the Kemps make the following claim: "The components of the subject property do not meet the B grade used to price the subject property. Nothing in the presentation of the State Board establishes [that] the admitted deviations equate to a B grade. It is error for the State Board to

Board, in its final determination, concluded that the Kemps' home was located in an "extremely desirable and attractive area." (Tr. of Proceedings at 18.) In their original tax appeal, the Kemps do not challenge this decision by the State Board.

ignore the established errors before them." (Pet'r Post–Hr'g. Br. at 8.) In essence, the Kemps maintain that the State Board's final determination is not supported by substantial evidence. In response, the State Board contends that the Kemps did not make a prima facie case that the assigned grade was improper.

Under Indiana's true tax value system, improvements are assigned various grades based on their materials, design and workmanship; the grades represent multipliers that are applied to the base reproduction cost of an improvement. *See* IND. ADMIN. CODE tit. 50, r. 2.2–10–3 (1996); *Whitley Prods. Inc. v. State Bd. of Tax Comm'rs,* 704 N.E.2d 1113, 1116 (Ind. Tax Ct.1998). When contesting the grade assigned an improvement, a taxpayer must offer probative evidence concerning the alleged assessment error. *See Herb v. State Bd. of Tax Comm'rs,* 656 N.E.2d 890, 894 (Ind. Tax Ct.1995); *Whitley Prods.,* 704 N.E.2d at 1119. A taxpayer's conclusory statements do not constitute probative evidence concerning the grading of the subject improvement. *See Whitley Prods.,* 704 N.E.2d at 1119. Mere references to photographs or regulations, without explanation, do not qualify as probative evidence. *See Heart City Chrysler v. State Bd. of Tax Comm'rs,* 714 N.E.2d 329, 333 (Ind. Tax Ct.1999). Furthermore, State Board hearing officers are not obligated to make a case for the taxpayer. *See Whitley Prods.,* 704 N.E.2d at 1118. Where the taxpayer fails to provide the State Board with probative evidence supporting his position on the grade issue, the State Board's duty to support its final determination with substantial evidence is not triggered. *See id.* at 1119–20.

The Court has examined the evidence presented to the State Board at the Kemps' administrative hearing and the subsequent inspection of Parcel 27. The Kemps submitted one sheet of paper with black and white copies of four photographs of the subject property, along with two actual color photographs of the property. (Joint Ex. 1.) In addition, they submitted a copy of the original property record card for Parcel 27, as well as a sample property record card for the property.[3] (Joint Ex. 2.) The Kemps also provided a copy of the grade specification table from Rule 7, page 12 of the 1992 Indiana Real Property Assessment Manual (Regulation 17). (Joint Ex. 2.) The grade specification table, which lists basic features associated with the designs and structures of the different grades found in the regulations, contained checks by descriptions in the B grade and C grade columns of the table. (Joint Ex. 2.) Two audiotapes were also provided to the Court; they were recordings of the Kemps' administrative hearing, along with recordings of other hearings held by the State Board on the same day. (Joint Ex. 3.) A copy of the State Board's transcript of proceedings was also admitted into evidence.[4]

---

**3.** Both cards reflect a sub-total base rate of $93,000 for the subject property. (Joint Ex. 2.) However, the original property record card applies a grade of B plus 1 to the base rate, resulting in a total reproduction cost of $121,940 for the property. (Joint Ex. 2.) *See also* IND. ADMIN. CODE tit. 50, r. 2.2–11–6 (1996) (Schedule F) (assigning a 130% multiplier to B plus 1 grade). The original property record card also applies a five percent adjustment for physical depreciation; this results in a true tax value of $115,800. As discussed *infra,* the sample property record card applies a C grade to the property, in addition to applying a five percent adjustment for physical depreciation and a twenty percent adjustment for obsolescence depreciation. (Joint Ex. 2.) *See*

*also* IND. ADMIN. CODE tit. 50, r. 2.2–11–6 (1996) (Schedule F) (assigning a 100% multiplier to C grade). The sample property record card, using these adjustments, calculates the property's true tax value to be $71,290. (Joint Ex. 2.)

**4.** At trial, the transcript of proceedings was admitted into evidence as Joint Exhibit four. (Trial Tr. at 5.) However, the parties did not submit a copy of this exhibit to the Court at the time or trial. (Trial Tr. at 4.) While the Court does not have an official Exhibit four to review, the Court has reviewed and will refer to the transcript of proceedings formally filed by the State Board on June 4, 1998, pursuant to IND CODE ANN. § 6–1.1–15–6 (West 1989).

Yuhan conducted a physical inspection of Parcel 27. (Trial Tr. at 11.) Neither the Kemps nor their representatives attended this inspection. (Trial Tr. at 19, 33.) In assessing the subject property, Yuhan reviewed the grade specification table. (Trial Tr. at 11.) She also referenced the representative grade pictures of Regulation 17. *See* IND. ADMIN. CODE tit. 50, r. 2.2–7–10 (1996). (Trial Tr. at 11.)

Mr. Stephen M. Hay (Hay) also testified at trial. Hay worked as a consultant for Landmark Appraisals, Inc., the company representing the Kemps before the State Board. (Trial Tr. at 25.) Hay testified that, in his opinion, the Kemps' home was a "straight C grade." (Trial Tr. at 26.) He used this C grade in filling out a sample property record card for Parcel 27. (Trial Tr. at 26; Joint Ex. 2.)

According to Yuhan, Hay's testimony at the administrative hearing "probably wasn't more than five minutes." [5] (Trial Tr. at 42.) With respect to grade, Hay gave Yuhan no evidence other than the photographs from Joint Exhibit one and the grade specification table from Joint Exhibit two. (Trial Tr. at 41.) At trial, Counsel for the State Board had the following exchange with Yuhan:

Q. Did [Hay] explain when he handed you the pictures what it was about the pictures that made him believe or led him to the conclusion that this house should be graded as a C?

A. No, he didn't say anything.

Q. When he handed you the Grade Specification Table, did he go through that table with you line by line and interpret either his checkmarks or anything else on the table

that led him to the conclusion that this house should not be rated a B?

A. No.

(Trial Tr. at 41.)

The Kemps failed to submit probative evidence on the issue of grade to the State Board. Hay's opinion that the Kemps' home deserves a C grade is a conclusory statement. He provided no foundation for applying the C grade to his sample property record card. Furthermore, Hay's checkmarks on the grade specification table, without further explanation, are also conclusory.[6] As noted *supra*, conclusory statements do not qualify as probative evidence. Yuhan had no duty to make the Kemps' case for them. It was the taxpayers' obligation to substantiate their claims with probative evidence before the State Board. Because they failed to do so, they did not meet their burden of production. Therefore, the State Board's duty to substantiate its final determination on the issue of grade was never triggered.

### III. *Uniformity of Assessments*

Finally, the Kemps allege that the State Board ignored evidence demonstrating a lack of uniformity in the assessments of residential properties in LaPorte. They claim that a sales ratio study (Study) conducted by Hay reveals that newer homes in LaPorte are assessed on average 57.5% higher than older homes. The Kemps essentially contend that the State Board's regulations, as applied, violate Article X, Section 1 of the Indiana Constitution, which provides in part: "The General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation and shall prescribe regulations to

---

**5.** Ms. Yuhan was generous. The Court's review of the audiotape of the administrative hearing of the Kemps' appeal indicates that the entire hearing lasted approximately two minutes and twenty seconds. (Joint Ex. 3.) The Court does note, though, that Yuhan did hear testimony regarding the same sales ratio study introduced by the Kemps in the present case and discussed *infra* in a hearing involving another of Hay's clients on the same day

as the Kemps' hearing. (Trial Tr. at 4, 39–40.)

**6.** Hay was being paid on a contingency fee basis. (Trial Tr. at 33.) The Court views Hay's statements in light of his contingency fee arrangement. *See Wirth v. State Bd. of Tax Comm'rs*, 613 N.E.2d 874, 877 (Ind. Tax Ct.1993).

secure a just valuation for taxation of all property, both real and personal."

To rectify this alleged discrepancy in assessments, the Study asserted that "the assessments of the six [newer] homes which have been appealed require[ ] a downward adjustment of 36.5%." (Joint Ex. 2.) At the administrative hearing, Hay requested that the State Board award the Kemps' home a twenty percent obsolescence depreciation adjustment. (Joint Ex. 3.) The State Board refused to grant the Kemps an adjustment for obsolescence depreciation. In its final determination, the State Board reached the following conclusion:

> After reviewing 50 IAC 2.2–7–9, it is determined [that] obsolescence depreciation is seldom applied to residential dwellings. There must be an extremely abnormal circumstance involved with a residential dwelling before obsolescence depreciation applies. The State of Indiana uses the Cost Approach method for assessing improvements rather than the Market Approach[,] so a ratio based on the Market Approach can not be addressed. No change in assessment is made.

(Tr. of Proceedings at 19.)

 While the Court will not entertain facial challenges to the State Board's regulations, it does hear as applied challenges. *See Dana Corp. v. State Bd. of Tax Comm'rs,* 694 N.E.2d 1244, 1247 (Ind. Tax Ct.1998). In order for such a challenge to succeed, a taxpayer must present specific evidence that an assessment is unconstitutional as applied to him. *See id.* Application of regulations in an unconstitutional manner constitutes an abuse of discretion by the State Board. *See Bielski v. Zorn,* 627 N.E.2d 880, 886 n.14 (Ind. Tax Ct.1994).

### A. Obsolescence Adjustment

 The Kemps requested a twenty percent obsolescence adjustment for their home. Obsolescence is the "diminishing of a property's desirability and usefulness brought about by either functional inadequacies or overadequacies inherent in the property itself, or adverse economic factors external to the property." IND. ADMIN. CODE tit. 50, r. 2.2–1–40 (1996). The regulations recognize two forms of obsolescence: functional and economic. *See id.,* r. 2.2–10–7(e); *Freudenberg–NOK Gen. Partnership v. State Bd. of Tax Comm'rs,* 715 N.E.2d 1026, 1029 (Ind. Tax Ct.1999), *review denied.* "Functional obsolescence is caused by internal factors. Economic obsolescence is caused by external factors." [7] IND. ADMIN. CODE tit. 50, r. 2.2–10–7(e) (1996). The determination of obsolescence is a two-step process whereby an assessor must first identify causes of obsolescence and then quantify the amount of obsolescence to be applied. *See Freudenberg–NOK,* 715 N.E.2d at 1029 (citations omitted). However, as the regulations make clear, "Obsolescence depreciation is seldom applied to residential dwellings. There must be an extremely abnormal circumstance involved with a residential dwelling before obsolescence depreciation applies." IND. ADMIN. CODE tit. 50, r. 2.2–7–9(d) (1996); *see also Simmons v. State Bd. of Tax Comm'rs,* 642 N.E.2d 559, 562 (Ind. Tax Ct.1994) (noting that "residential improvements do not receive obsolescence adjustments, like commercial improvements do"). To obtain an obsolescence adjustment, the Kemps had a burden to produce evidence showing that their home suffered from an extremely abnormal circumstance.

 The Kemps, through Hay, introduced no evidence whatsoever at the

---

**7.** Functional obsolescence has numerous possible causes, including: (1) inefficient floor plans; (2) unnecessary or superadequate construction; (3) inadequate parking; and (4) mechanical inadequacy. *See Pedcor Invs.– 1990–XIII, L.P. v. State Bd. of Tax Comm'rs,* 715 N.E.2d 432, 435 (Ind. Tax Ct.1999) (citations omitted). Possible causes of economic obsolescence include: (1) inoperative or inadequate zoning ordinances; (2) deed restrictions; and (3) market acceptability of the product or devices for which the property was constructed or is currently used. *See id.*

administrative hearing showing that an extremely abnormal circumstance was present in their home that justified application of an obsolescence adjustment. In fact, the Kemps identified no causes of obsolescence.[8] Therefore, the State Board correctly denied the Kemps an obsolescence adjustment for their home. *Cf. White Swan Realty v. State Bd. of Tax Comm'rs*, 712 N.E.2d 555, 560 (Ind. Tax Ct.1999) (concluding that obsolescence adjustment for commercial property was not warranted where taxpayer provided "no evidence in the record showing that the property suffers from any cause of obsolescence"), *review denied.*

### B. *Sales Ratio Study*

That the Kemps' home did not qualify for an obsolescence adjustment does not mean that their constitutional claim fails. The obsolescence adjustment was merely the proposed remedy to an alleged unconstitutional inequity. Thus, the Court must ascertain whether the Kemps offered specific evidence showing that the State Board's regulations, as applied to their assessment, were unconstitutional.

██ To support the assertion that their home and other newer homes in La-Porte were on average assessed at a higher value than older homes, the Kemps offered the Study into evidence as part of Joint Exhibit two. A sales ratio study (also referred to as an assessment-ratio study) is "designed to compare assessed value to market value property." INSTITUTE OF PROPERTY TAXATION, PROPERTY TAXATION 154 (Jerrold F. Janata ed., 2d ed.1993). A sales ratio study is "undertaken principally for evaluating assessment accuracy and achieving tax equalization." *Id.*

██ Indiana does not value property based on its market value; rather the assessed value of property is based on its reproduction cost as determined by the State Board's regulations. *See Lake County Trust Co. No. 1163 v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1253, 1258 (Ind. Tax Ct.1998), *review denied* ; *Zakutansky v. State Bd. of Tax Comm'rs*, 696 N.E.2d 494, 496 (Ind. Tax Ct.1998) (citing IND. CODE ANN. § 6–1.1–31–6 (West 1989)); *Dawkins v. State Bd. of Tax Comm'rs*, 659 N.E.2d 706, 708–09 (Ind. Tax Ct.1995); and *GTE North, Inc. v. State Bd. of Tax Comm'rs*, 634 N.E.2d 882, 886 (Ind. Tax Ct.1994). *Cf. Barker v. State Bd. of Tax Comm'rs*, 712 N.E.2d 563, 572 (Ind. Tax Ct.1999) ("However, evidence of actual reproduction cost may have relevance in certain cases.") (citations omitted). The Study compares sales figures, i.e. market data, with the assessed values of the listed homes. Thus, given the approach of Indiana's property assessment system, the Kemps were obligated to show how use of this market data helps demonstrate that the State Board's regulations, as applied, violated their right to an equal and uniform assessment under the Indiana Constitution.

The Kemps have not persuaded this Court that a study based on market values can validly demonstrate the alleged inequity of assessments made under Indiana's system. Without citing to authority, the Kemps assert that a "ratio study does not establish a 'value,' but measures a deviation from a standard; [it] measures general equality and uniformity." (Pet'r Reply Br. at 5.) Their argument misses the point. The deviations measured by the ratios in the Study represent a comparison of two "values"—a property's market value

---

**8.** The sample property record card submitted by Hay calculated the assessed value of the Kemps' home using a twenty percent adjustment for obsolescence. (Joint Ex. 2.) This calculation, absent any explanation, is conclusory and in no way reflects whether the Kemps' home suffered from causes of obsoles-

cence. *Cf. Clark,* 694 N.E.2d at 1241 n.17 (noting that witness' conclusory statement as to applicable level of obsolescence would not, on remand, satisfy taxpayer's burden of quantifying obsolescence because percentage presented was baseless and because witness was contingently paid).

and its assessed value.[9] A sales ratio study, prepared using professionally acceptable standards, would measure the uniformity of assessments under a market based assessment system. However, the Kemps do not sufficiently explain how the Study demonstrates uniformity of assessments calculated using the true tax value system.[10]

The State Board is required to deal with a taxpayer's evidence in a meaningful manner, but only if the evidence has probative value. *See Clark*, 694 N.E.2d at 1235. In the present case, the Kemps did not demonstrate that the Study was relevant in determining the correctness of their assessment. Therefore, the State Board did not abuse its discretion in refusing to consider the Study.[11]

The Study was the only evidence provided by the Kemps supporting their constitutional claim. Without it, they lacked any specific evidence showing that the State Board's regulations, as applied, violated their rights to a uniform and equal assessment under the Indiana Constitution. Therefore, this claim too must fail.

## CONCLUSION

For all of the aforementioned reasons, the Court hereby AFFIRMS the State Board's final determination in this matter.

9. At trial, Hay testified that market data must be used to establish a reliable "baseline" against which deviations could be measured for purposes of determining whether the regulations have been applied accurately in an assessment. (Trial Tr. at 36–37.) However, Hay admitted that to his knowledge the State Board's regulations do not "specifically spell out the use of [baselines] for the measurement [of deviations]." (Trial Tr. at 38.)

10. As observed in INSTITUTE OF PROPERTY TAXATION, PROPERTY TAXATION 159–61 (Jerrold F. Janata ed., 2d ed.1993):

In theory, the property's fair market value tells little or nothing about whether the valuation is correct [under Indiana's "true tax value" standard].... The real problem with the true tax value standard is the lack of uniformity among taxpayers. If taxpayers are assessed at varying fractions of their fair market value, those with higher fractional assessments may have legitimate complaints. Of course, this begs the question whether, as long as assessments are entered in accordance with the [Indiana Real Property Assessment] Manual, there is any valid legal objection based on the lack of a uniform assessment ratio compared to fair market value.... [B]ecause of the lack of any uniform relationship between true tax value and fair market value, no standard percentage exists by which to equalize

assessments to insure uniformity vis-à-vis fair market value.

See generally the line of *Town of St. John v. State Bd. of Tax Comm'rs* cases, which provide additional insight into Indiana's property tax system. 665 N.E.2d 965 (Ind. Tax Ct.1996), *rev'd*, 675 N.E.2d 318 (Ind.1996), *opinion on remand*, 690 N.E.2d 370 (Ind. Tax Ct.1997), *aff'd in part, rev'd in part*, 702 N.E.2d 1034 (Ind.1998).

11. The Study also has a third page, which is a copy of page thirteen from the "Report of the Indiana Fair Market Value Study." (Joint Ex. 2.) The report, dated December 10, 1996, in part provides "We find that older homes are systematically under-assessed, at approximately .5% per year. This indicates that a 50 year old home is approximately 30% under-assessed relative to a market standard than is a new home." (Joint Ex. 2.) This page, however, was not admissible as proof that the Kemps' property was incorrectly assessed. The fair market study cited on this third page was authorized by the General Assembly pursuant to Pub.L. No. 63–1993. This act specifically provided that the "report and data collected in the study may not be used in a ... review of assessment under ... IC 6–1.1–15." Thus, even had the State Board considered the fair market study in reaching its conclusion, it would have abused its discretion in so doing.