**KING INDUSTRIAL CORP., Petitioner,**

v.

**STATE BOARD OF TAX COMMISSIONERS, Respondent.**

No. 49T10–9610–TA–00151.

Tax Court of Indiana.

Sept. 15, 1998.

John R. Rumple, Sharpnack, Bigley, David & Rumple, Columbus, for Petitioner.

Jeffrey A. Modisett, Attorney General, Joel Schiff, Deputy Attorney General, Indianapolis, for Respondent.

FISHER, Judge.

King Industrial Corporation (King) appeals a final determination of the State Board of Tax Commissioners (State Board) denying a kit adjustment [1] for property it owns. This Court, finding that the State Board's decision to deny the kit adjustment and to apply the "D + 1" grade is not supported by substantial evidence, REVERSES the State Board's final determination.

---

1. The kit adjustment is a 50% reduction in base price. The adjustment is designed to be applied to some light pre-engineered, or kit type, buildings to account for their low cost economical design and construction. *See* IND. ADMIN. CODE tit. 50, r. 2.1–4–5 (1992) (presently codified at *id.* r. 2.2–11–6 (1996)).

## FACTS AND PROCEDURAL HISTORY

King is a tool and die manufacturer located in Jackson County, Indiana. King conducts its operations in four buildings it owns. The buildings were constructed in four stages. The first building was erected in 1945. A second building was added in 1964. As business continued to expand, King added a third building in 1973. Finally, in 1986, King added a fourth building. The first three buildings are used in King's tool and die manufacturing process. The fourth building is used by King for office space.[2]

King's buildings were assessed as of March 1, 1993. King filed a Form 130 Petition for Review of Assessment with the Jackson County Board of Review on January 11, 1994 for the 1993 tax year. The County Board of Review did not alter King's assessment. King filed a Form 131 Petition for Review of Assessment with the State Board on November 3, 1994 alleging that its buildings were entitled to a reduction in base price because they were kit buildings. The State Board issued a final determination on September 20, 1996 that denied King a kit adjustment. King filed this original tax appeal on November 1, 1996, and a trial was held on November 17, 1997. Additional facts will be supplied as necessary.

## ANALYSIS AND OPINION

### Standard of Review

 This Court gives the final determinations of the State Board great deference when it acts within the scope of its authority. *Garcia v. State Bd. of Tax Comm'rs*, 694 N.E.2d 794, 795–96 (Ind. Tax Ct.1998). This Court reverses final determinations of the State Board only when those decisions are unsupported by substantial evidence, are arbitrary or capricious, constitute an abuse of discretion, or exceed statutory authority. *Id.* at 796.

### Discussion

On February 22, 1991, the State Board ordered township assessors to reassess pre-designed, pre-engineered buildings based on amendments to the State Board's cost schedules. (Pet'r Ex. 2 at Ex. "A" and Ex. "C"). These amendments provided for a 50% reduction in base price for some light pre-engineered or kit type buildings. (Pet'r Ex. 2 at Ex. "A" and Ex. "C"); *see also Bock Prods., Inc. v. State Bd. of Tax Comm'rs*, 683 N.E.2d 1368, 1372 (Ind. Tax Ct.1997). Kit buildings are generally made of light weight and inexpensive materials and are "fabricated at central manufacturing facilities and shipped to the construction site ready for fast and efficient assembly." (Pet'r Ex. 2 at Ex. "D") (hereinafter Instructional Bulletin 91–8). The reduction in base price was offered due to the low cost and economical quality of materials used in kit buildings. On October 1, 1991, the State Board issued Instructional Bulletin 91–8 to aid assessors in determining which buildings qualified for the 50% reduction.

Instructional Bulletin 91–8 contains several examples of common characteristics of low-cost kit buildings. Among these are Cold Form Cee Channel wall supports, tapered roof beams, H columns, X bracing, metal or steel exterior skin, and round steel columns. Instructional Bulletin 91–8 at 4–5. Instructional Bulletin 91–8 also states that an economical kit building's steel purlins and girders are normally 14 to 16 gauge, that the concrete floors have minimal tolerances, that all vertical supports must be spaced evenly, and that normal building widths range from 30 feet to 120 feet. Instructional Bulletin 91–8 at 6.

Although Bulletin 91–8 is designed to clarify the definition of a kit building, it has often been more confusing than helpful. The bulletin's use of language such as "economical," "minimal tolerances," "normal," and "heavy loads" in the description of common kit building components leaves much to the discretion of an assessor. In fact, Instructional Bulletin 91–8 labels the kit building identification factors as "clues" rather than calling them definitive characteristics or necessary components.[3] With such unclear definitions as

---

**2.** King's four buildings are connected to one another. Throughout this opinion, all of King's buildings will be referred to collectively as the buildings or King's buildings.

**3.** It is unclear whether the State Board intends

"minimal" and "normal," it is difficult to see how any consistency or uniformity in applying the kit building adjustment can be achieved among assessors. This, of course, presents the danger that the Indiana Constitution's requirement of uniform and equal property assessments will be violated. *See* IND. CONST. art. X, § 1(a). However, this Court is also aware that a precise and inflexible definition might hinder an assessor's efforts to arrive at the proper assessment for a building.[4]

Instructional Bulletin 91–8 also discusses the use of grade factors[5] in conjunction with the kit building adjustment. Grade factors can be applied to adjust for various additional building features included in a kit building. However, the instructional bulletin notes that if the additional features of the kit building result in the building no longer being economical, then it cannot qualify for the kit adjustment.[6] Instructional Bulletin 91–8 at 7. If the building does not qualify for the kit adjustment, the assessor may apply "a low

---

4. In any system of mass appraisal, a certain amount of flexibility and subjective judgment must be included in the assessment process. The use of cost schedules, models, and land classifications are commonly used to save time and money when assessing property. These mechanisms allow an assessor to compare basic characteristics of a subject property to models and arrive at an estimate of the property's value. *See Town of St. John v. State Bd. of Tax Comm'rs*, 690 N.E.2d 370, 378 n. 16 (Ind. Tax Ct.1997) (the use of cost schedules in and of itself is not a problem) *review granted*, 695 N.E.2d 123 (Ind.1998). However, in any such mass appraisal system, invariably, certain properties are over-assessed and some are under-assessed. In most states, these inevitable flaws in the mass appraisal techniques are corrected, inter alia, through the presentation of evidence of actual value during the appeal process.

In states that allow such evidence, sales data from the area, actual construction costs, and income capitalization are all instructive as to the actual value of a piece of property. Indiana, however, has elected to shun such information and not accept it as probative of value. *See Dawkins v. State Bd. of Tax Comm'rs*, 659 N.E.2d at 709; *see also Town of St. John*, 690 N.E.2d at 374. This creates a troublesome situation. Either the taxpayer accepts the State Board's entirely subjective, self-referential, determination, or the taxpayer attempts to challenge the assessment and argue over vague and undefined terms, such as "heavy" or "minimal."

The Court must then attempt to apply regulations that are better suited for mass appraisal than the adjudication of specific cases. Such is the problem here. Instructional Bulletin 91–8 may provide excellent instructions aiding an assessor in quickly spotting a candidate for the kit adjustment. It is, however, woefully inadequate for purposes of determining with any degree of certainty whether a building is, in fact, a kit building. Typically in these appeals, the State Board attempts to mask the problem of uncertainty by referring to its discretion. *See Canal Square*, 694 N.E.2d at 808. However, subjective decisions are still subject to judicial review, *see Clark v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1230, 1236 (Ind. Tax Ct.1998), and the State Board may not support a final determination with an unsupported subjective determination.

5. *See* IND ADMIN. CODE tit. 50, r. 2.1–4–3 (1992) (presently codified at *id.* r. 2.2–10–3 (1996)).

6. The Court notes that Instructional Bulletin 91–8 does not define economical nor does the bulletin disclose any method of determining what is economical. Bulletin 91–8 does refer to the increase in construction cost associated with the use of higher tolerance materials as a factor that renders a kit building no longer economical. Instructional Bulletin 91–8 at 7. The use of actual construction cost as a measure of whether a building is economical is somewhat peculiar in light of the fact that assessments in Indiana are not based on actual reproduction costs but rather the reproduction cost as calculated under the State Board's regulations. *See* IND CODE ANN. § 6–1.1–31–6 (West 1989); *Dawkins v. State Bd. of Tax Comm'rs*, 659 N.E.2d 706, 709 (Ind. Tax Ct.1995).

---

Instructional Bulletin 91–8 to be a precise definition of a kit building or a set of flexible rules allowing discretion on the part of assessors so that they may arrive at the correct assessment. Based on the vague language used in Bulletin 91–8, it appears that the latter is more likely. In raising this point, the Court merely wishes to explain that the entire dispute in this case might have been avoided had the definition and characteristics of a kit building been clearly delineated by the State Board. Although a precise and inflexible definition would have prevented some economical pre-engineered buildings from receiving the kit adjustment, this should be of no consequence because the kit adjustment should only be a means to an end. That end is to arrive at the correct assessment. The correct assessment could be arrived at through other means such as an adjustment in grade.

In Indiana, taxpayers are required pay property taxes based on assessments determined under the State Board's regulations. Whether the correct assessment is attained through a kit adjustment or through the application of a reduced grade factor should not be the primary point of concern. Rather, arriving at the correct final assessed value of the property should be the target at which we aim.

grade and design factor to account for the lower cost of construction."[7] (Resp't Br. at 6). Regardless, the Court notes that the kit adjustment, the grading system, and the assessment process in general are a means to an end. Clearly, the goal of the entire assessment process is to arrive at the correct True Tax Value[8] for each improvement and parcel of land in Indiana. Whether a kit adjustment is given and then the building's grade is adjusted to account for additional amenities, or a kit adjustment is denied and a grade factor is assigned to account for the lower quality of the materials used, should be of little import.[9] What is important is that a correct assessment is attained.[10] With this in mind the Court now turns to the merits of this case.

█ King argues that its buildings are kit buildings and should be given the 50% reduction in base price under the General Commercial Industrial cost schedule. See IND. ADMIN. CODE tit. 50, r. 2.1–4–5, Schedule A.2. King points out that its buildings are "brand name kit type dealer distributed structure[s]." (Pet'r Br. at 1). King submitted a letter into evidence from the manufacturer of two of its buildings stating that the buildings are pre-engineered steel buildings. (Pet'r Ex. 2 at Ex. "F"). In addition, King argues

that its buildings contain at least ten of the State Board's kit building characteristics. (Pet'r Br. at 2).

For instance, King argues that its concrete floors can only support minimal tolerances. King points out that the floors are cracked where fork trucks have driven on them and had to be reinforced in locations where heavy machinery sits. (Pet'r Ex. 1) (Tr. at 22–23). King also argues that the buildings' support columns and roof beams can only support minimal tolerances. In support of this assertion, King offered testimony to indicate that its two hoists, which are free standing, would be attached to the building were the building able to support the weight. (Pet'r Ex. 1) (Tr. at 24).

The State Board argues that the steel columns in King's buildings support greater tolerances than those allowed by the kit adjustment. (Resp't Br. at 6) (Tr. at 57–60). Moreover, King's buildings have the minimum bay spacing allowed under Bulletin 91–8 and the buildings are not of standard kit building size and shape. (Resp't Br. at 6) (Tr. at 61). Finally, the State Board offered testimony that a portion of King's buildings appeared to be of custom design. (Tr. at 62). However, none of these things absolutely

---

7. Grade factors ranging from "A" to "E" are applied to account for the construction qualities of a particular building. See IND. ADMIN. CODE tit. 50, r. 2.1–4–3 (1992) (presently codified at id. r. 2.2–10–3 (1996)). Under the State Board's regulations, a "C" grade building is considered average and is assigned a grade factor of 100%, (i.e., 100% of the reproduction cost as determined under the State Board's regulations). See id. The remaining grades indicate a factor of 160% of the base price for "A" grade buildings, 120% for "B" grade buildings, 80% for "D" grade buildings, and 60% for "E" grade buildings. Id.

The State Board recognizes that buildings sometimes fall between the major grade classifications. Therefore, intermediate grade levels may be assigned to indicate the building's grade falls between the major grade classifications. Id. A designation of "+/–2" indicates the grade falls halfway between the major grade classifications. Id. A "+/–1" indicates that the grade is slightly above or below the major grade assigned. Id. The selection of which grade to apply calls for the subjective judgment of the assessor and should be a "composite judgment of overall quality and design." See IND. ADMIN. CODE tit. 50, r. 2.1–4–3(f) (1992) (presently codified at id. r. 2.2–

10–3(a) (1996)); see also Garcia, 694 N.E.2d at 796.

8. See IND CODE ANN. § 6–1.1–31–6.

9. The Court understands that some taxpayers may prefer to have their assessment begin at a lower point (i.e., 50% of the base price) and then have the assessment be increased based on the application of a grade factor instead of the opposite. However, the Court does not consider the effect of such a preference to be relevant in arriving at a correct assessment.

10. As previously discussed, the True Tax Value of a building may only be calculated through the application of the State Board's regulations. See IND.CODE ANN. § 6–1.1–31–6; see also Dawkins, 659 N.E.2d at 709; see also Town of St. John, 690 N.E.2d at 374. This Court has previously noted that the State Board's regulations contain numerous examples of imprecise self-referential terms and definitions. See Garcia, 694 N.E.2d at 798; see also Town of St. John, 690 N.E.2d at 386. The ill-defined kit adjustment standards are simply another example of the subjective tautological nature of the State Board's regulations.

disqualify a building from receiving the kit adjustment.

■ The "clues" included in Bulletin 91–8 to aid assessors in determining whether a building qualifies as a kit building are vague at best. The decision to award the kit building adjustment or a lower grade factor is entirely subjective with few, if any, ascertainable standards. In this case, the State Board's hearing officer admitted that he was unsure whether the reinforced concrete flooring was confined only to those areas underneath heavy machinery. (Tr. at 60). The hearing officer testified that he "may have made a mistake" regarding the concrete flooring. (Tr. at 62). Moreover, the fact that King's buildings are not of standard size and shape are of no avail. This Court has previously held that a building may still qualify for the kit adjustment even though it contains minor enhancements. "[S]light additions to the basic 'kit' model can be accounted for by simply raising the grade factor." *Componx, Inc. v. State Bd. of Tax Comm'rs,* 683 N.E.2d 1372, 1375 (Ind. Tax Ct.1997). Therefore, modifications King has made to its buildings do not necessarily disqualify them from receiving the kit adjustment.[11]

■ In addition to its denial of the kit adjustment, the State Board applied a grade factor of D + 1 to King's buildings to account for the low quality of the materials used. There is no evidentiary support for the decision to assign a grade of "D + 1" and on the basis of the record the Court has no way of determining whether a "D + 1," as opposed to any other grade, is the correct grade. *See Corey v. State Bd. of Tax Comm'rs,* 674 N.E.2d 1062, 1066 (Ind. Tax Ct.1997) (Court must be apprised of the basis of a State Board final determination so that it may properly review a final determination); *see*

*also Bailey Seed Farms v. State Bd. of Tax Comm'rs,* 542 N.E.2d 1389, 1392 (Ind. Tax Ct.1989). When a building is graded a "D + 1," the reproduction cost is subsequently reduced by 15%. Accordingly, the State Board must show how the particular characteristics of a building translate into that lower reproduction cost. In other words, the State Board must quantify the effects of a building's deviations from the "C" grade on the reproduction cost of that building. *See Clark,* 694 N.E.2d at 1237; *see also Zakutansky,* 696 N.E.2d at 496; *see also Garcia,* 694 N.E.2d at 798. However, the State Board has failed to provide any support for its application of the "D + 1" grade assigned to King's buildings. The State Board may not support its findings with unsupported subjective opinions. *See Canal Square Ltd. Partnership v. State Bd. of Tax Comm'rs,* 694 N.E.2d 801, 808 (Ind. Tax Ct.1998); *see also Corey v. State Bd. of Tax Comm'rs,* 674 N.E.2d 1062, 1066 (Ind. Tax Ct.1997).

Although the Court has little to guide it regarding the important characteristics of a kit building, the Court cannot hold for the State Board when its own hearing officer admits a possible mistake in assessing the building. Furthermore, there is no evidentiary support for the State Board's decision to apply the "D + 1" grade factor to King's buildings. The State Board has not attempted to show how any of the materials used in King's buildings equate to a grade of "D + 1." Regardless of whether the State Board granted the kit adjustment, denied the kit adjustment, or lowered the grade factor, it must support its decision with substantial evidence. *See Clark,* 694 N.E.2d at 1237; *see also Zakutansky v. State Bd. of Tax Comm'rs,* 696 N.E.2d 494, 496 (Ind. Tax Ct.1998); *see also Garcia,* 694 N.E.2d at 798.

**11.** In *Componx,* this Court held that an adjustment in grade factor was appropriate because none of the modifications done to the subject building affected the structure but were merely "cosmetic enhancements." *Componx,* 683 N.E.2d at 1375. This is not to say that slight modifications or variations in the structural components of a pre-engineered building necessarily prevent it from qualifying for the kit adjustment. This is evidenced by the language of Instructional Bulletin 91–8. Not only does the bulletin use language such as minimal and normal (leading to the inference that slight variations in structure are acceptable), but Bulletin 91–8 specifically refers to the use of increased grade to account for "quality differences of the … supports and/or roof beams." Instructional Bulletin 91–8 at 7. Moreover, Bulletin 91–8 specifically allows some buildings to qualify for the kit adjustment in spite of mixed support systems, described as "upgrades." Instructional Bulletin 91–8 at 7.

It has not done so. Therefore, this Court is compelled to hold that the State Board's final determination is arbitrary and capricious and is unsupported by substantial evidence. This Court must REMAND this issue to the State Board for further consideration.

## CONCLUSION AND REMAND INSTRUCTIONS

This Court has held that in certain circumstances a taxpayer must offer evidence of a competing view of an assessment in order to demonstrate the invalidity of a State Board assessment. *See Clark,* 694 N.E.2d at 1234 (discussing prima facie case formulation). Such a requirement allows this Court a reasonable opportunity to understand the competing view points and aids this Court in arriving at a decision. *See id.* at 1241 (noting how the failure of the taxpayer to present a full and complete case results in a waste of time and scarce judicial resources). However, once the taxpayer has presented a prima facie case, the State Board must offer evidence to rebut the taxpayer's claim. *Id.* This results from the State Board's duty not to act arbitrarily and capriciously. *Id.* at 1235; *see also Western Select Properties v. State Bd. of Tax Comm'rs,* 639 N.E.2d 1068, 1075 (Ind. Tax Ct.1994) (State Board cannot simply refuse to recognize taxpayer's evidence). The kit building adjustment is one example of a case where the taxpayer must attempt to offer such a competing view of the assessment.

■ The taxpayer must offer probative evidence tending to prove it is entitled to the kit adjustment. Once the taxpayer has made a prima facie case, the State Board must either award the kit adjustment or offer evidence and an explanation as to why the taxpayer is not entitled to it. This process will not only allow disputes to be resolved at the State Board level, but will allow this Court the opportunity to determine whether the State Board has considered and dealt with the taxpayer's evidence in a meaningful manner. *Clark,* 694 N.E.2d at 1235.

On remand, the State Board may decide to award King the kit adjustment and adjust for any additional amenities included in King's buildings by using a grade factor. The State Board may determine that King's buildings do not qualify for the kit adjustment and may then adjust downward using a grade factor. In either case, the State Board must provide evidentiary support and reasoning for its final determination. Any decision to deny the kit adjustment must be based on clearly explained factors contained in the State Board's final determination. Moreover, any grade factor applied must be supported by evidence showing the grade factor is related to actual features that increase or decrease the reproduction cost of the building.

In this case, the State Board's hearing officer admitted that he may have made an error in reviewing King's buildings. Furthermore, this Court has previously held that minor modifications in a kit building do not automatically disqualify it from receiving the kit adjustment. Moreover, the State Board has failed to provide evidentiary support for its decision to apply the "D+1" grade to King's buildings. Therefore, the State Board's final determination is arbitrary and capricious and not supported by substantial evidence. This Court REMANDS this matter to the State Board for further consideration consistent with this opinion.