DAMON CORPORATION, Petitioner,

v.

**INDIANA STATE BOARD OF TAX COMMISSIONERS,** Respondent.

No. 49T10–9701–TA–88.

Tax Court of Indiana.

Nov. 13, 2000.

Tamatha A. Stevens, McMains, Goodin & Orzeske, Indianapolis, IN, Attorney for Petitioner.

Karen M. Freeman–Wilson, Attorney General of Indiana, Laureanne Nordstrom, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

Damon Corporation (Damon) appeals the Elkhart County Board of Review's (BOR) determination that Damon is liable for the additional taxes accessed against the property for 1989–1993.[1] Damon also appeals the State Board of Tax Commissioner's (State Board) final determination denying Damon's request to lower the assessed value of its property for the 1994 assessment year. In this original tax appeal, Damon presents the following issues for this Court's review:

I. whether Damon is a bona fide purchaser as defined under IND.CODE ANN. § 6–1.1–9–4(b) (West 2000) and thus its property is not sub-

---

1. Although Damon asserted in its form 131 petition and argues to this Court that it is appealing taxes for 1989–1993, the tax bill that it received was for "1989 pay 1990" through "1992 pay 1993." (Pet'r. Exhibit 3.) In Indiana, taxes are paid one year after property is assessed. *See Graybar Elec. Co. v. State Bd. of Tax Comm'rs*, 723 N.E.2d 491, 495 (Ind.Tax Ct.2000). Consequently, the tax assessment years at issue are 1989–1992. Moreover, Damon is claiming that no lien can attach to its property for taxes levied for years prior to its purchase. Damon purchased the property in December of 1992. As such, it owned the property at issue during the 1993 tax assessment year. Nonetheless, this fact is not material to the outcome of this case.

ject to a lien for additional taxes assessed for the assessment dates prior to its purchase of the property;

II. whether the State Board's determination that obsolescence should not be applied to Damon's property in the 1994 assessment was arbitrary and capricious or an abuse of discretion; and

III. whether the State Board abused its discretion and acted arbitrarily and capriciously in failing to apply the kit building adjustment to Damon's property in its 1994 assessment.

## FACTS AND PROCEDURAL HISTORY

In 1989, Mallard Coach Company, Inc. (Mallard) owned two parcels of property with improvements in Elkhart County, Indiana.[2] Mallard appealed the 1989 property tax assessment on these two parcels to the State Board. While the appeal was pending, the property taxes were billed at the 1988 value. While the appeal was still pending, in December of 1992, Damon purchased the property from Mallard. On October 7, 1993, Damon was sent a bill for additional property taxes due for the tax years 1989–1992. This bill was a result of the State Board's determination that the value of the property was higher than the 1988 assessment. In 1994, Damon filed a form 131 petition for review of assessment

(131 Petition) with the State Board for the years 1989–1993 claiming that it was not liable for the taxes because it was a bona fide purchaser pursuant to I.C. § 6–1.1–9–4(b). The State Board did not hold a hearing or make a final determination on Damon's 131 Petition.[3]

In addition, in 1994, Damon filed another form 131 petition for review of the 1994 assessed value of parcel number 40–13–35–202–11 with the Elkhart County Auditor's Office. Thereafter, the State Board held a hearing on this 131 Petition. The State Board subsequently issued its final determination on Damon's petition, lowering the assessed value of the improvements. However, the State Board declined to grant Damon any obsolescence depreciation or a kit building adjustment.

On January 6, 1997, Damon filed an original tax appeal with this Court appealing both the 1989–93 additional taxes for which it was billed and the State Board's final determination regarding its 1994 assessment of parcel number 40–13–35–202–11. Additional facts will be provided as necessary.

## ANALYSIS AND OPINION

### Standard of Review

■ This Court gives final determinations of the State Board great deference when the State Board acts within the scope of its authority. *See Freudenberg-NOK General Partnership v. State Bd. of*

---

2. The parcels of property in question are numbers 40–13–35–202–011 and 40–13–35–202–012 and are located in Nappanee, Indiana.

3. In 1994, Damon filed its 131 Petition seeking review of the tax years 1989–1993, and the State Board has since not made a final determination. Therefore, this Court looks to the code provision applicable in 1994 to determine whether this Court has jurisdiction to decide this case. *See State Bd. of Tax Comm'rs v. Mixmill Mfg.*, 702 N.E.2d 701, 703 n. 3 (Ind.1999). Pursuant to IND.CODE ANN. § 6–1.1–15–4(e) (West 1989):

[i]f the state board of tax commissioners fails to conduct a hearing and make a final

determination required under this section within twelve (12) months after the state board receives a petition for review in a nonreassessment year and twenty-four (24) months in a reassessment year, the person who petitioned for review may initiate an appeal under section 5 of this chapter in the same manner as if the state board had made a final determination affirming the county board of review's action with respect to the assessment.

Because Damon initiated this appeal after the requisite time period for the State Board to make its final determination had passed, this Court has jurisdiction to decide this case.

*Tax Comm'rs,* 715 N.E.2d 1026, 1028–29 (Ind.Tax Ct.1999). Accordingly, this Court reverses final determinations of the State Board only when they are unsupported by substantial evidence, are arbitrary or capricious, constitute an abuse of discretion, or exceed statutory authority. *See id.* at 1029.

In addition, a taxpayer challenging the validity of the State Board's final determination bears the burden of demonstrating the invalidity of the final determination. *See Clark v. State Bd. of Tax Comm'rs,* 694 N.E.2d 1230, 1233 (Ind.Tax Ct.1998). The taxpayer must present a prima facie case (a case in which the evidence is "sufficient to establish a given fact and which if not contradicted will remain sufficient"). *GTE North Inc. v. State Bd. of Tax Comm'rs,* 634 N.E.2d 882, 887 (Ind. Tax Ct.1994) (citations and internal quotation marks omitted). To establish a prima facie case, the taxpayer must offer probative evidence concerning the alleged error. *See King Indus. v. State Bd. of Tax Comm'rs,* 699 N.E.2d 338, 343 (Ind.Tax Ct.1998); *Whitley Prods., Inc. v. State Bd. of Tax Comm'rs,* 704 N.E.2d 1113, 1119 (Ind.Tax Ct.1998), *review denied.* "Once the taxpayer carries the burden of establishing a prima facie case, the burden shifts to the State Board to rebut the taxpayer's evidence and justify its decision with substantial evidence." *Clark,* 694 N.E.2d at 1233. To carry its burden, the State Board must do more than merely assert that it assessed the property correctly. *Loveless Const. Co. v. State Bd. of Tax Comm'rs,* 695 N.E.2d 1045, 1049 (Ind. Tax Ct.1998), *review denied.* Instead, the State Board must offer an authoritative explanation of its decision to rebut the taxpayer's prima facie showing. *See id.*

## Discussion

### *I. Bona Fide Purchaser*

The first issue is whether Damon is a bona fide purchaser as defined under I.C. § 6–1.1–9–4(b) and thus its property is not subject to a lien for additional taxes assessed for the assessment dates prior to its purchase of the property. As an initial matter, this Court notes that because the State Board did not make a final determination on this issue, this Court reviews this issue "in the same manner as if the state board had made a final determination affirming the county board of review's action with respect to the assessment." IND. CODE ANN. § 6–1.1–15–4(e) (West 1989); *See also supra* note 3. As this Court is statutorily instructed to review this issue as if it were a final determination, for purposes of clarity this Court hereafter will refer to it as a "final determination."

Damon argues that pursuant to I.C. § 6–1.1–9–4(b) it is a bona fide purchaser of the parcels at issue and therefore its property is not subject to a lien for the additional taxes billed to it for the assessment dates prior to its purchase of the property.

Indiana Code § 6–1.1–9–4 provides:

(a) Real property may be assessed, or its assessed value increased, for a prior year *under this chapter* only if the notice required by section 1 of this chapter is given within three (3) years after the assessment date for that prior year.

(b) With respect to real property which is owned by a bona fide purchaser without knowledge, no lien attaches for any property taxes which result from an assessment, or an increase in assessed value, *made under this chapter* for any period before his purchase of the property.

I.C. § 6–1.1–9–4 (emphasis added). This Court has previously stated that "[w]hen faced with a question of statutory interpretation, this Court looks first to the plain language of the statute. Where the language is unambiguous, this Court has no power to construe the statute for the purpose of *limiting or extending its operation.*" *Joyce Sportswear Co. v. State Bd. of Tax Comm'rs,* 684 N.E.2d 1189, 1192 (Ind.Tax Ct.1997) (original emphasis) (in-

ternal quotation marks omitted), *review denied.*

▐ The plain language of I.C. § 6–1.1–9–4 clearly mandates that both subsections (a) and (b) apply *only* to assessments or increased assessments made under Chapter 9, which governs the assessment of *omitted or undervalued* tangible property. *See id.* In *Joyce Sportswear Co. v. State Bd. of Tax Comm'rs*, this Court held that I.C. § 6–1.1–9–4(a) did not apply to proceedings under I.C. § 6–1.1–15–4. *See id.* Specifically, this Court held that by the language "under this chapter" in I.C. § 6–1.1–9–4(a) the General Assembly had limited the reach of the statute and that this Court did not have the power to extend the statute. *See id.* Similarly, this Court holds today that the reach of I.C. § 6–1.1–9–4(b) is limited to actions involving the assessment of omitted or undervalued tangible property under Chapter 9.

▐ No evidence has been presented regarding Mallard's reasons for appealing the 1989 assessment.[4] Consequently, there is no evidence that Mallard appealed the 1989 assessment on the basis that the property had been undervalued or omitted pursuant to I.C. § 6–1.1–9–1 to 9–9. As such, Damon is not afforded the protection of a bona fide purchaser under I.C. § 6–1.1–9–4(b) because the protection of that section is limited to assessments or reassessments under Chapter 9. Consequently, a prima facie case that Damon's property should not be subject to a lien for the additional taxes has not been made. *See*

---

4. When questioned by this Court regarding whether the property was under valued and thus fell under Chapter 9, Damon responded: Well, *if* the taxpayer and the taxing officials *possibly believed* that the assessed value for 1990 was the '88 value under the statute, and that is what they billed them at, and that is what they assessed them at, then the final determination is what increased the assessment. It wasn't the '89 assessment standing. It was, "wash away the '89 assessment, and let's review the whole thing and determine what the assessment should be." *If* that were the case, then it would definitely fall under [chapter] nine, and that is what everything indicated to our taxpay-

*GTE North Inc.*, 634 N.E.2d at 887. Therefore, this Court AFFIRMS the final determination, which held Damon's property is subject to a lien for the additional taxes. *See Freudenberg–NOK*, 715 N.E.2d at 1029.

## II. Obsolescence

The next issue is whether the State Board's determination that obsolescence should not be applied to Damon's subject improvement in the 1994 assessment was arbitrary and capricious or an abuse of discretion. Damon contends that its property suffers from both functional and economic obsolescence. Specifically, Damon asserts that obsolescence "is warranted due to the proven poor market acceptability and low desirability of the property." (Damon's Post-trial Br. at 12.)

"The True Tax Value of a commercial improvement is determined by calculating the reproduction cost of the improvement (as determined by an application of the State Board regulations) and subtracting any physical and obsolescence depreciation." *Loveless Const. Co.*, 695 N.E.2d at 1047. The regulations define obsolescence as a functional and economic loss of value. *See* IND.ADMIN.CODE tit. 50, r. 2.1–5–1 (1992) (codified in present form at *id.*, r. 2.2–10–7(e) (1996)). Functional obsolescence is caused by factors internal to the property and is "evidenced by conditions within the property." *Id.* Economic obsolescence is caused by factors that are ex-

---

er. Our taxpayer did not have any availability, any evidence out there to find that. (Amended Oral Argument Tr. at 17.) (emphasis added.) This completely speculative response by Damon does not constitute probative evidence showing that Mallard's appeal to the State Board was made under Chapter 9. *See Whitley Prods.*, 704 N.E.2d at 1119. Therefore, Damon has not met its burden of presenting a prima facie case with regard to this issue. *See Herb v. State Bd. of Tax Comm'rs*, 656 N.E.2d 890, 893 (Ind.Tax Ct.1995) (holding that "[a]llegations, unsupported by factual evidence, remain mere allegations").

ternal to the property. *See id.* In the commercial context, a loss of value usually represents a decrease in the improvement's income generating ability. *See Loveless Const.*, 695 N.E.2d at 1047. In *Clark v. State Board of Tax Commissioners*, this Court concluded that as a prerequisite for this Court to review a taxpayer's case, during its hearing before the State Board the taxpayer must follow a two-step process whereby a taxpayer must first identify causes of obsolescence and then quantify the amount of obsolescence to be applied. *See Clark*, 694 N.E.2d at 1241. However, as this case arose before *Clark*, the taxpayer here was not required to quantify its evidence, but simply to identify it. *See id.*

■ This Court now looks to whether Damon's contentions that its payment of less than the true tax value for the property, the vacancy of the property for over a year before Damon purchased it, or Damon's building being under construction constitute a prima facie case that its property was entitled to 30% economic obsolescence for the 1994 tax year. Damon argues that its above stated contentions show that the property suffered from poor market acceptability and low desirability and therefore it is entitled to economic obsolescence. However, Damon does not cite any authority that supports low market acceptability and low desirability of the property as indicators of economic obsolescence, and the Court's research reveals no authority for Damon's proposition.[5] *Cf.*

*Pedcor Investments–1990–XIII, L.P. v. State Bd. of Tax Comm'rs*, 715 N.E.2d 432, 436–37 (Ind.Tax Ct.1999) (holding that where the *product* for which the property was constructed was rental apartments, economic obsolescence can be caused by deed restrictions because the marketplace may have a negative reaction to those restrictions). Therefore, Damon's assertion is a mere allegation and does not constitute probative evidence that economic obsolescence is present. *See Whitley Prods., Inc.*, 704 N.E.2d at 1119. Nonetheless, this Court addresses each of Damon's contention's below to determine if they show a loss in value that would indicate that obsolescence should be applied.

### A. True Tax Value Verses Purchase Price

■ Damon argues that the disparity between the true tax value of its property and the price for which it purchased the property is evidence that the property has poor proven market acceptability and low desirability and is thus entitled to obsolescence. More specifically, Damon argues that it is entitled to economic obsolescence because the true tax value of the property is 33% greater than what it paid for the property. Damon presented evidence that the true tax value of the property was $296,670[6] and the price for which it purchased the property was $200,000. Damon seems to assert that the $200,000 price that it paid for the property was the property's fair market value. (Damon's Post-trial Br. at 13–14; Damon's Reply Br. at 5

5. The Court notes that Damon contends that obsolescence is warranted because the *property* has poor market acceptability. As Damon points out, one of the reasons for economic obsolescence that is set forth by the regulations is "[m]arket acceptability of the *product or devices* for which the property was constructed or is currently used." IND.AD-MIN.CODE tit. 50, r. 2.1–5–1 (1992) (codified in present form at *id.*, r. 2.2–10–7(e) (1996) (emphasis added)). This "market acceptability" appears, by its plain language, to be limited to the marketability of the *"product or devices* for which the property was constructed or is currently used." *Id.* (emphasis added) Damon has not presented any evidence of the prod-

ucts or devices for which it utilizes the property. As such, it also has not presented evidence of the lack of market acceptability of those products or devices. Therefore, this factor, listed in the regulations, does not further Damon's case.

6. The evidence and testimony presented at trial listed the true tax value at $299,670. However, in Damon's Post-trial Brief, it asserts that the true tax value was $296,670. For the purposes of this case, this Court will use the figure of $296,670, the number stated in Damon's Post-trial Brief.

(arguing that the "purchase price was likely the result of an arms length transaction"); Trial Tr. at 14 (stating that "[Damon] came in and bought the property at a fair value")). The difference between the true tax value of the property and price for which Damon purchased the property (market value) does not demonstrate a loss in value because the two numbers are not necessarily comparable.[7] *See State Bd. of Tax Comm'rs v. Town of St. John,* 702 N.E.2d 1034, 1038 (Ind.1998) (holding that "true tax value" is not exclusively or necessarily identical to fair market value). The statute in effect during the tax year for which Damon is appealing provides: "[w]ith respect to the assessment of real property, *true tax value does not mean fair market value.* True tax value[8] is the value determined under the rules of the state board of tax commissioners." IND. CODE ANN. § 6–1.1–31–6(c) (West 2000) (emphasis added). Consequently, the difference between the true tax value of Damon's property and the price Damon paid for the property, two unrelated numbers, does not demonstrate that there has been a loss in value of the subject improvement.[9] Thus, no probative evidence has been presented that identifies a cause of obsolescence here. Therefore, a prima facie case has not been established that, based upon the difference between these numbers, obsolescence is present.

### B. Vacancy of Building

■ Next, Damon argues that the vacancy of the building shows that the property has poor proven market acceptability and low desirability, thus making it eligible for obsolescence. At trial, Damon presented the testimony of an employee of a property tax consulting firm that the building was vacant for "well over a year" prior to Damon purchasing it. (Trial Tr. at 14.) However, a prima facie case has not been established because Damon has not presented any evidence explaining the reason that the property was vacant for over one year or whether the property was on the market during that time. Damon simply states that Mallard had filed for bankruptcy, without telling us the reasons for the bankruptcy. Accordingly, probative evidence has not been presented that identifies a cause of obsolescence here. Consequently, Damon's unsupported allegation that the vacancy of the property prior to its purchase indicates obsolescence does not constitute a prima facie case that the property suffered a loss and is entitled to obsolescence. *See Herb v. State Bd. of Tax Comm'rs,* 656 N.E.2d 890, 893 (Ind. Tax Ct.1995) (holding that "[a]llegations, unsupported by factual evidence, remain mere allegations").

### C. Building Under Construction

■ Finally, Damon argues that the lack of use of the building addition[10] while it was under construction warrants greater than the forty percent obsolescence that it claims it was given previously in its assess-

---

7. At trial, the State Board called Steven Schultz, an assessor, who testified that he questioned whether the purchase price of property could be considered in determining whether economic obsolescence was applicable. (Trial Tr. at 23)

8. True tax value of an improvement is calculated by the "reproduction cost" of the item, less any physical depreciation or obsolescence depreciation to which it is entitled. IND.ADMIN.CODE tit. 50, r. 2.1–5–1 (1992). Reproduction cost is defined as the "whole-dollar cost of reproducing the item." IND.ADMIN.CODE tit. 50, r. 2.1–4–2 (1992). The "reproduction cost" of an improvement, however, is not the actual cost of reproducing the item. Rather, it is based upon base rates and adjustments in the State Board's "cost schedules." *See* IND.ADMIN CODE tit. 50, r. 2.1–4–5 (1992). Thus, the "true tax value" of an improvement does not necessarily approximate its market value.

9. Schultz testified at trial that "we don't base our assessments on either the closing statement or purchase price of property; we base our assessments on 50 IAC 2.2." (Trial Tr. at 26.)

10. Damon does not tell this Court what "building" or "addition" is at issue here.

ment.[11] The State Board's final determination concluded that Damon was entitled to zero obsolescence. Therefore, this Court looks to whether economic obsolescence can be applied to Damon's addition while it was under construction.[12] Damon argues that obsolescence was applicable here because the building was only sixty percent complete and did not have heat or lights.[13] Therefore, Damon asserts that the building was "virtually useless" or "completely unusable." (Damon's Post-trial Br. at 14; Reply Br. at 5.)

▉▉▉▉ In order for an obsolescence adjustment to be made, there must be some *loss* in value. *See Pedcor Investments*, 715 N.E.2d at 439–40. Generally, obsolescence cannot be applied to a building that is under construction because its useful life has not yet begun. *See id.* at 440. This Court has previously stated that an "interpretation of the regulations to allow for an obsolescence adjustment merely because a building is vacant while it is under construction would lead to palpably absurd results." *Id.* Damon is not entitled to economic obsolescence here because its building under construction had not begun its useful life. *See id.* Moreover, Damon's assertion that its building

was "virtually useless" or "completely unusable" while under construction does not demonstrate that it suffered a loss in value, because if it was being newly constructed, it would not have had any previous value to lose. (Damon's Post-trial Br. at p. 14; Reply Br. at 5.) Therefore, no probative evidence has been presented that identifies a cause of obsolescence here. Consequently, a prima facie case of economic obsolescence has not been presented.

A prima facie case that Damon is entitled to functional[14] or economic obsolescence has not been presented. *See GTE North Inc.*, 634 N.E.2d at 887. As such, the State Board is not required to rebut Damon's case. *See Clark*, 694 N.E.2d at 1233. Accordingly, this Court AFFIRMS the final determination of the State Board with regard to the obsolescence issues because Damon has not demonstrated that the State Board acted in an arbitrary and capricious manner. *See Freudenberg–NOK*, 715 N.E.2d at 1029.

### III. Kit Building

The final issue is whether the State Board abused its discretion and acted arbitrarily and capriciously in failing to apply

---

11. In responding to a question on whether the assessor applied obsolescence to Damon's incomplete building, the assessor replied:

> On the property record card it may appear as obsolescence, but I indicated that the percentage adjustment that was entered into that area on the property record card, it's identified as obsolescence depreciation as its heading. I'd entered a forty percent factor in there to reduce the remainder value by forty percent to a true tax value that would represent sixty percent from the course of the remainder value, and I had indicated that that factor, that forty percent, was to reflect the incomplete status of that addition rather than either functional or economic obsolescence.

(Trial Tr. at 24–25.)

12. Damon does not state in its Post-trial Brief whether it is appealing functional or economic obsolescence with regard to this issue. The Court would appreciate the taxpayer's designation of the type of obsolescence (and the

development of an argument relevant thereto) that the taxpayer contends it should receive instead of forcing this Court to guess what the taxpayer is arguing. *Cf. North Park Cinemas, Inc. v. State Bd. of Tax Comm'rs*, 689 N.E.2d 765, 769 (Ind.Tax Ct.1997) (holding that a hearing officer did not have an affirmative duty to make a case on behalf of a party, rather a party is responsible for presenting evidence and an argument in support of its position). Because Damon asserts that while the building was under construction it was useless, this Court assumes that Damon is arguing that the incomplete building was economically obsolescent. *See Pedcor Investments*, 715 N.E.2d at 439–40.

13. However, in Damon's Post-trial Briefs it does not direct this court to any evidence that shows lack of heat or lights.

14. The Court notes that Damon has not identified any functional obsolescence issues in its Post-trial Briefs or developed any argument regarding functional obsolescence.

the kit building adjustment to Damon's property in its 1994 assessment. The State Board bases its decision not to apply a kit building adjustment to Damon's property on its assertion that Damon had altered the building structurally by adding two additions to the main building.

In 1991, the State Board amended its regulations to include a fifty percent reduction in the base rate for certain light pre-engineered or kit-type buildings. *See Whitley Prods.*, 704 N.E.2d at 1121; IND.ADMIN.CODE tit. 50, r. 2.1–4–5 (Schedules A1 and A2) (1992) (codified in present form at *id.*, r. 2.2–11–6 (Schedule A.4) (1996)). Thereafter, the State Board issued Instructional Bulletin 91–8 to provide guidance to assessors in determining which light pre-engineered buildings qualified for the reduction. *See Componx, Inc. v. Indiana State Bd. of Tax Comm'rs*, 683 N.E.2d 1372, 1374 (Ind.Tax Ct.1997). Generally, kit buildings are made of light weight and inexpensive materials and are "fabricated at central manufacturing facilities and shipped to the construction site ready for fast and efficient assembly." Instructional Bulletin 91–8 at 1; *See also King Indus.*, 699 N.E.2d at 339. The reduction in base price is offered because of the low cost and economical quality of materials used in kit buildings. *See King Indus.*, 699 N.E.2d at 339.

Instructional Bulletin 91–8 sets forth several examples of common characteristics of low-cost kit buildings. According to Instructional Bulletin 91–8, the "key element in identifying this low cost economical 'kit-type' structure is the type of interior column and roof beam support." Instructional Bulletin 91–8 at 4. Some examples of characteristics of these column and roof beam systems include: Cold Form Cee Channel wall supports, tapered columns, H columns, and steel post columns. *See id.* at 4–5. Instructional Bulletin 91–8 also provides assessors with "other identification clues" that a building is a "kit building" including: X bracing, metal or steel exterior skin, steel purlins and girders that are normally 14 to 16 gauge, concrete floors that have minimal tolerances, evenly spaced vertical supports, and normal building widths ranging from 30 feet to 120 feet. *Id.* at 6; *see also King Indus.*, 699 N.E.2d at 339.

■ Damon argues that it is entitled to the kit building adjustment because it has presented evidence that its building qualifies for the adjustment. At trial, Mark Drew Miller testified on behalf of Damon, stating that "[t]he main structure, as far as the framing and the interior and exterior of the building, does comply with the guidelines set out by the State Tax Board." (Trial Tr. at 17–18.) He also testified that the building had tapered columns, Cee channels, and cross bracing and that the building's dimensions fell within the guidelines.[15] (Trial Tr. at 18) This is probative evidence that Damon's building qualifies for the kit building adjustment. *See* Instructional Bulletin 91–8 at 4–6; *King Indus.*, 699 N.E.2d at 339. Miller, however, noted that the attached office building would not qualify for the kit adjustment. Miller posited that the main 17,440 square foot structure qualified as a kit building. Because Damon has presented evidence that its building had tapered columns and Cee channels (both key factors in identifying kit buildings) as well as cross bracing, this Court concludes that Damon has established a prima facie case that its building is eligible for a kit building adjustment. *See King Indus.*, 699 N.E.2d at 343; *Whitley Prods.*, 704 N.E.2d at 1119.

**15.** In its final determination, the State Board concluded, with regard to grade, that "the structure is constructed with low cost economy materials and workmanship throughout." (Defendant's Ex. A.) This Court notes that for purposes of kit building identification, Instructional Bulletin 91–8 also states that only low cost and economical versions of pre-designed and pre-engineered structures qualify for kit building status. Instructional Bulletin 91–8 at 3.

Because Damon has presented a prima facie case, the burden shifts to the State Board to rebut Damon's evidence and justify its decision with substantial evidence. *See King Indus.*, 699 N.E.2d at 343; *Clark*, 694 N.E.2d at 1233. The State Board did not contest Damon's evidence. In fact, at trial, hearing officer Schultz, testified that "the main-the original structure less the three additions [16] that were added, excluding the original office, may have qualified for the kit adjustment." (Trial Tr. at 28.) The State Board's sole reason for denying the kit building adjustment was because the structure had been altered by two additions to the main building. (Def's Ex. A.)

It is true that changes that affect the structural integrity of a building *could* prevent it from receiving the kit building adjustment. *See Componx*, 683 N.E.2d at 1375. However, under Instructional Bulletin 91–8, slight modifications or variations in the structural components of a pre-engineered building *do not necessarily* prevent it from qualifying for the kit adjustment.[17] *See* Instructional Bulletin 91–8 at 7; *King Indus.*, 699 N.E.2d at 342 n. 11; *Barker v. State Bd. of Tax Comm'rs*, 712 N.E.2d 563, 570 (Ind.Tax Ct.1999) (stating that "Instructional Bulletin 91–8 allows kit buildings to have stronger structural support systems than that of the basic kit model"). Instructional Bulletin 91–8 allows improvements to deviate somewhat from the basic kit model and still qualify for the adjustment. *See Morris v. State Bd. of Tax Comm'rs*, 712 N.E.2d

1120, 1123 (Ind.Tax Ct.1999); *Componx, Inc.*, 683 N.E.2d at 1375; Instructional Bulletin 91–8 at 7. Instructional Bulletin 91–8 also discusses the use of grade factors in conjunction with the kit building adjustment. Instructional Bulletin 91–8 at 7. According to Instructional Bulletin 91–8, certain deviations from the basic kit model can be accounted for by increasing the grade of the improvement being assessed. *See Componx, Inc.*, 683 N.E.2d at 1375; Instructional Bulletin 91–8 at 7; *King Indus.*, 699 N.E.2d at 340. However, if the additional features of the kit building result in the building no longer being economical, then it cannot qualify for the kit adjustment. Instructional Bulletin 91–8 at 7. If a building does not qualify for the kit adjustment, an assessor may apply "a low grade and design factor to account for the lower cost of construction." *King Indus.*, 699 N.E.2d at 340–41 (internal quotations omitted).

 During trial, the State Board presented testimony that a 39,000 square foot addition to the rear of the facility and a 4,000 square foot addition adjacent to the facility structurally modified the original structure. The State Board presents us with no authority for its proposition that additions to a building (that would otherwise qualify as a kit building) per se render the main structure ineligible. Beyond size, the State Board did not supply this Court with any description of the physical characteristics of the additions or any explanation of how the additions structurally modify the main building. Because the

---

16. Earlier during the trial, Schultz testified that there were *two* additions to the main building. Based upon the majority of testimony at trial, this Court assumes that there are two, not three additions. However, the number of additions is not relevant to the outcome of this case.

17. In discussing the language in Instructional Bulletin 91–8 that supports the proposition that slight variations in structural components would not necessarily disqualify a building for a kit adjustment, this Court previously stated:

Not only does the bulletin use language such as minimal and normal (leading to the inference that slight variations in structure are acceptable), but Bulletin 91–8 specifically refers to the use of increased grade to account for "quality differences of the … supports and/or roof beams." Moreover, Bulletin 91–8 specifically allows some buildings to qualify for the kit adjustment in spite of mixed support systems, described as "upgrades." Instructional Bulletin 91–8 at 7.

*King Indus.*, 699 N.E.2d at 342 n. 11 (internal citations omitted).

additions identified by the State Board do not automatically disqualify the main building from receiving the kit adjustment, the State Board was required to do more than simply point to the additions to support its final determination in this case.[18] *See Morris*, 712 N.E.2d at 1124. Therefore, the State Board has not supported its decision to deny Damon the kit building adjustment with substantial evidence. *See Clark.*, 694 N.E.2d at 1233. Consequently, the State Board's final determination was arbitrary and capricious and an abuse of discretion.[19] Because Damon has presented a prima facie case that its building qualifies for the kit building adjustment and the State Board has not rebutted Damon's case with substantial evidence, we REVERSE Damon's case with regard to this issue and grant it the kit building adjustment. *See Morris*, 712 N.E.2d at 1124. This Court REMANDS this issue to the State Board with the following instructions. *See id.*

▮▮▮▮▮▮ On remand, the State Board must assess the main building as a kit building and then adjust the assessment to account for the reproduction cost of the additional features. *See id.* at 1126. The State Board must quantify the effect of these additional features on the reproduction cost of the building and support its quantification with substantial evidence. *See id.* Moreover, because the application of the kit adjustment in this case may create an error in the D–2 grade assigned to the subject improvement, the State Board may alter the grade of the subject improvement. *See id.* However, any adjustment to the grade, other than to a C, must be supported with substantial evidence and the State Board is required to include detailed written findings explaining its calculations. *See id.;* Instructional Bulletin. 91–8 at 7 (providing that "[t]he basic version of the economy 'kit type' structure should be graded a 'C' "). If the State Board adjusts the grade, Damon must be given the opportunity to present evidence relevant to the grading of the subject improvement.[20] *See Barker*, 712 N.E.2d at 571. In making its assessment, the State Board may assess the main building separately from its additions

**18.** The State Board must identify the characteristics of an improvement that it contends render the improvement ineligible for a kit adjustment. *See Morris*, 712 N.E.2d at 1124. Then, "the State Board [is] required to quantify the effect of the subject improvement's deviations from the basic kit model on the subject improvement's reproduction cost to determine whether those deviations rendered the subject improvement no longer economical." *Id.* Consequently, when faced with evidence demonstrating that an improvement qualifies for the kit adjustment, the State Board cannot simply "point to a deviation from the basic kit model and use that deviation to justify the denial of a kit adjustment, unless the deviation specifically disqualifies the improvement for the kit adjustment or the deviation increases the cost of the improvement so that the improvement is no longer economical." *Id.* at 1123–24.

**19.** Damon also contends that the State Board denied its kit building adjustment because the State Board gave Damon's building a D–2 grade. Damon's assertion is based upon testimony by the assessor that typically the assessors consider either a grade reduction or kit adjustment, but not both. During trial the hearing officer stated that typically assessors "consider one or the other, a grade reduction or kit." (Trial Tr. at 28.) In commenting on the grade that he recommended, he also stated that "often a petitioner would request a kit adjustment or a reduced grade in lieu of the kit adjustment." (Trial Tr. at 23–24.) This Court reminds the State Board that it is not permitted to use a grade adjustment in lieu of a kit adjustment. *See Morris*, 712 N.E.2d at 1125; *See Barth, Inc. v. State Bd. of Tax Comm'rs*, 699 N.E.2d 800, 805 (Ind.Tax Ct.1998) (holding that "[u]nder the State Board regulations, a building must be given a kit adjustment if it qualifies for that adjustment"), *reh'g denied;* IND.ADMIN.CODE tit. 50, r. 2.1–4–5 (Schedules A1 and A2) ("Deduct 50% of base price (1st floor) for pre-engineered kit-type structure").

**20.** If Damon asserts that the grade should be lower than a "C," Damon has the burden of proving with probative evidence that the lower grade is appropriate. Should Damon choose to challenge the "C" grade, then the State Board must be given the opportunity to present relevant evidence regarding grade.

when determining the assessed value of that improvement, just as an assessor may assess any improvement by breaking the improvement into parts and assessing those parts separately. *See Morris,* 712 N.E.2d at 1126. Instructional Bulletin 91–8 does not mandate that improvements alleged to qualify for the kit adjustment must necessarily be assessed as a whole.[21] *See id.*

## CONCLUSION

For the foregoing reasons, the Court hereby AFFIRMS the Elkhart County Board's determination that Damon is liable for the additional taxes assessed for the years prior to Damon's purchase of the property. This Court hereby AFFIRMS

the State Board's determination that Damon is not entitled to an obsolescence adjustment for its 1994 property assessment. This Court hereby REVERSES the State Board's final determination as it relates to the applicability of the kit building adjustment to Damon's 1994 property assessment and REMANDS this issue to the State Board for further proceedings consistent with this opinion.

**21.** Arriving at the most accurate assessment is the goal. *See Morris,* 712 N.E.2d at 1126. This Court notes that the Department's regulations permit application of a separate base rate for each distinct area of a building with two or more use types. *See* IND.ADMIN.CODE tit 50, r. 2.1–4–1 (1992) (providing formula for determining base rate for mixed use building) (codified in present form at *id.* tit 50, 2.2–10–2 (1996)).